951 A.2d 885

**Brandon WASHINGTON**

v.

**STATE of Maryland.**

**No. 1709 Sept. Term, 2006.**

Court of Special Appeals of Maryland.

July 1, 2008.

Marc A. DeSimone, Jr. (Nancy S. Forster, Public Defender, on the brief), Baltimore, for Appellee.

Beverly Peyton Griffith (Douglas F. Gansler, Atty. Gen., on the Brief), Baltimore, for Appellee.

Panel: DAVIS, HOLLANDER, JJ., and CHARLES E. MOYLAN, JR., J. (Retired, Specially Assigned).

HOLLANDER, Judge.

Following a trial held in June of 2006, a jury in the Circuit Court for Baltimore City convicted Brandon Washington, ap-

pellant, of possession of a firearm by a prohibited person and wearing and carrying a handgun. *See* Md.Code (2003), § 5–101(g) and § 5–133 of the Public Safety Article ("P.S.") (possession of a firearm by a prohibited person); Md.Code (2002), § 4–203 of the Criminal Law Article ("C.L.") (wearing and carrying a handgun).[1] The court subsequently sentenced appellant to a mandatory term of five years for the offense of firearm possession by a prohibited person, and to a concurrent three-year term for the wearing and carrying offense.

Appellant presents four questions, which we quote:

1. Did the trial court err in interrupting appellant's closing argument and precluding defense counsel from arguing a competing interpretation of the evidence to the jury because the judge "agreed with the State's interpretation" of one item of evidence?

2. Did the trial judge impermissibly usurp the jury's role as sole and exclusive triers of fact when she instructed the jury that they may not consider defense counsel's proffered interpretation of the evidence in any manner?

3. Whether the trial court committed plain error in allowing the State to cross-examine appellant through a series of "were they lying" questions[.]

4. Whether the trial court impermissibly limited the appellant's right to cross-examine his accusers[.]

We conclude that the trial court abused its discretion by precluding appellant's closing argument. Therefore, we shall vacate the judgments of conviction and remand for further proceedings.

### Factual And Procedural Summary[2]

Between 10:30 p.m., and 11:30 p.m. on November 12, 2005, Officer Earl Thompson and Detective Fabien Laronde of the

---

1. Appellant was acquitted of possession of cocaine.

2. Appellant has not challenged evidentiary sufficiency. Therefore, we recite only the portions of the trial evidence necessary to provide a

Baltimore City Police Department "FLEX Squad" received a call from a known, confidential source informing them of a suspect in the 400 Block of Lyndhurst[3] Avenue in Baltimore City who was possibly armed with a handgun. In particular, Laronde testified that the officers "received a call for discharging in the area." Accordingly, Thompson and Laronde, accompanied by Officer Lash, drove to Lyndhurst Avenue, where they saw a suspect whom they later identified as appellant.

At the time, the officers were in plainclothes and in an unmarked vehicle. Nevertheless, appellant spotted them as they drove into the area. According to Officer Thompson, appellant "looked at [their] vehicle," started to walk away, and then began to run as they came near. Thompson explained that while the officers chased appellant in their car, appellant "made a gesture with his right arm as though he was throwing a metal object up into the air onto a roof in the block." Thompson also recalled that appellant traveled about 30 feet before the officers caught up with him. Laronde exited the car and apprehended appellant. With the aid of "Foxtrot," a police helicopter with a searchlight, the police located the suspicious object on the roof of a porch of an abandoned house. Laronde entered the building and retrieved the item— a fully loaded handgun. Appellant was arrested and, in a search of his person incident to that arrest, the police recovered a ziplock bag containing cocaine.

The police submitted the handgun for ballistics and fingerprint testing, and the State introduced the test results into evidence. In particular, State's Exhibit 1A is a "Firearms

context for our discussion of the issues presented. *Cf. Singfield v. State*, 172 Md.App. 168, 170, 913 A.2d 671 (2006) (recitation of trial evidence unnecessary to address issue on appeal), *cert. denied*, 398 Md. 316, 920 A.2d 1060 (2007); *Martin v. State*, 165 Md.App. 189, 193, 885 A.2d 339 (2005) (same), *cert. denied*, 391 Md. 115, 892 A.2d 478 (2006); *Pearlstein v. State*, 76 Md.App. 507, 520, 547 A.2d 645 (1988) (finding no need to "recapitulate ... the massive [trial] evidence presented"), *cert. denied*, 314 Md. 497, 551 A.2d 867 (1989).

**3.** The street is spelled "Lindhurst" in the transcript.

Identification Unit–Firearms Report," which contains a physical description of the firearm, including its make, model, serial number. The report also notes that the weapon was "test fired," found "operable," and meets the definition of a handgun. State's Exhibit 1B is the report from the police "Laboratory Section," titled "Request for Firearms Examination." The form contains appellant's name, as well as the make and model of the weapon and the date of processing for latent prints (11/29/05). Moreover, it indicates that the "Results" of the latent fingerprint test were "Negative."

Officer Thompson was examined about both reports. The following exchange is relevant:

[PROSECUTOR:] Directing your attention back to the firearms report [i.e., Exhibit 1A]. What, if any other information is contained on that report below the comments section?

[THOMPSON:] The last checkmark states, this weapon meets the definition of a handgun as described in Annotated Code of Maryland, Criminal Law 4–201 and is operable and was test fired.

[PROSECUTOR:] Is that the handgun that you recovered on November 12th, 2005?

[THOMPSON:] Yes.

[PROSECUTOR:] Did you recover it?

[THOMPSON:] No, Officer Laronde recovered it off the roof.

[PROSECUTOR:] Did he wear gloves when he recovered it, if you know?

[THOMPSON:] No.

[PROSECUTOR:] When he—were you wearing gloves?

[THOMPSON:] No.

[PROSECUTOR:] Why not?

[THOMPSON:] I didn't put my [sic] on that day.

* * *

I didn't put any gloves on that day.

* * *

[PROSECUTOR:] State's Exhibit 1B. Do you recognize that document?

[THOMPSON:] Yes.

[PROSECUTOR:] What is it?

[THOMPSON:] It's a laboratory section request for firearms examination for latent prints.

[PROSECUTOR:] And is there any information with respect to latent prints? First of all, what are latent prints?

[THOMPSON:] Latent prints is [sic] fingerprints that are leftover [sic] once a handgun is held.

[PROSECUTOR:] And is there any information contained on that piece of paper with respect to latent prints?

[THOMPSON:] Yes.

[PROSECUTOR:] What, if any information is on there?

[THOMPSON:] By the technician that examined the weapon *[it] came back for negative prints.*

[PROSECUTOR:] What does that mean?

[THOMPSON:] *No prints could be lifted off the weapon.*

\* \* \*

[PROSECUTOR:] Did you handle that firearm?

[THOMPSON:] Yes.

[PROSECUTOR:] Were you wearing gloves?

[THOMPSON:] No.

(Emphasis added.)

The State did not call an expert witness to explain the process of gathering latent fingerprint evidence or the specifics of how fingerprint testing is conducted. Nor did the State produce expert evidence to explain that certain surfaces, such as the handgun in issue, may not yield fingerprints.

The results of the fingerprint testing became an issue during closing argument. The prosecutor's summation included the following comment with regard to the test results:

The next form you have is State's Exhibit 1B and the important thing about 1B is this is basically the second page of the firearms report and down at the bottom it says

"processed for latent prints," and then it says who it was processed by and it also says the results of the latent prints test were negative. Well, what does that mean? That means it was negative. (Inaudible) Well, you would say the next question is, "Well, how could that be?" We heard Officer Laronde testify that he picked up that handgun with his bare hands. We heard Officer Thompson say he picked up that handgun with his bare hands. So, if they picked it up, why wouldn't their prints be on it. *Well, the reason that their prints weren't on it is that the surface of the handgun is such that there can't be prints that are obtained from it, because they were incapable of getting prints off of this handgun, because, surely, if they would have gotten any prints, they would have gotten the prints of the two officers who admitted holding that handgun.* (Emphasis added.)

In her closing argument, the defense attorney stated, in part:

Now, ladies and gentlemen, we have a gun. We don't have a problem (inaudible). However—and we also stipulated (inaudible), which you'll receive (inaudible), that the gun was submitted. The State would have you believe that when the gun was submitted, *the prints came back negative.* Well, they did come back negative. They came back negative for the officers. Why? Because they weren't looking for the officers' prints. *They were looking for Mr. Washington's prints.* (Emphasis added.)

The prosecutor objected, and the trial court sustained the objection. The prosecutor then asked the court to tell "the jury ... to disregard that[,]" and a sidebar was convened. The following ensued:

THE COURT: (Inaudible.)

[PROSECUTOR:] Yes, that it just came back as negative as to any prints, meaning there were no prints even recovered from the handgun. There was nothing. So it's not even as if there were prints that they could have even analyzed to compare to the police officers'. There was nothing.

[DEFENSE COUNSEL]: Well, Your Honor, the report says that it was negative. We haven't had anyone come in and testify to the contrary.

THE COURT: Does the report say that they couldn't get a latent print?

[DEFENSE COUNSEL]: It says "latents." That's what it says, Your Honor, and then it says—down at the bottom, it says "negative."

[PROSECUTOR]: Meaning that there were no prints.

[DEFENSE COUNSEL]: It says up top who they were searching for; the defendant's full name, Brandon Washington.

THE COURT: The defendant's full name identifies the case..

[PROSECUTOR]: Right. When they open up the gun, they have to—

THE COURT: (Inaudible.)

[PROSECUTOR]: Right.

THE COURT: I don't think a fair interpretation (inaudible) that even if there were latents, none of them matched Brandon Washington. *Your argument to the jury is that there were latent prints and none of them matched against Brandon Washington. That's not a fair interpretation of this report. So the objection is sustained* because that is not a fair interpretation of this report.

[DEFENSE COUNSEL]: Well, Your Honor, there's nothing that indicates that it wasn't done either, that it wouldn't have been Brandon Washington. They wouldn't have looked for the officer's prints. *They're looking for Brandon Washington's prints on the gun, on the handgun.*

THE COURT: (Inaudible) processed for latent prints and the results are negative, that is, if they didn't have any prints to even put in to compare. (Inaudible.) They didn't even compare them to the general public. So the objection is sustained.

[PROSECUTOR]: And I'm asking that you instruct the jury to disregard the last statement that was made to them.

THE COURT: This is a motion to strike—

[PROSECUTOR]: Yes.

THE COURT:—the statement concerning the fingerprint comparison?

[PROSECUTOR]: Yes.

[DEFENSE COUNSEL]: Then, Your Honor, I would still make the same, just for the record, the same objection.

\* \* \*

Or not objection, but—

THE COURT: The report is in evidence. If an appellate authority has to review it, they'll see that it says there's a negative result for latent prints. I believe that's what the report says. (Inaudible.)

(Emphasis added.)

As noted, the jury convicted appellant of two handgun offenses. Appellant filed a Motion for a New Trial, arguing that the court had impermissibly limited his closing argument. At the motion hearing, defense counsel maintained that her argument was in response to the State's argument, explaining:

And the State also hit on the point where it says there was nothing to indicate that there was a comparison to any of the prints. However, the State used that in his closing argument saying if the officer's prints had come up then there would have been something to indicate that.

And that's exactly what ... we're arguing in this particular instance, Your Honor, that we don't know if there was the officer's—that the officer's prints were tested for because *the document requested examination for Brandon Washington's prints.* So we don't know if a comparison—or if the officer's prints would have come up or if they did come up because we didn't have the Examiner Turner to come and sit in this seat to indicate that. *We argued the four corners of the document, Your Honor.* (Emphasis added.)

In denying the motion, the court stated:

As to latent prints, the report states, "processed for latent prints November 29th, 2005 by T. Turner. Result-negative.["] Based on this single notation *the Defense sought to argue in closing argument that there were fingerprints recovered from the gun, that fingerprints on the gun came back negative after examination for Mr. Washington's fingerprint and that the request for examination of the fingerprints was exclusively for Mr. Washington.*

In opposition the State argued that the report simply stated that the gun had been processed for latent fingerprints with negative results, meaning that the gun had no latent fingerprints recovered from it. *The State argued that State's Exhibit 1B failed to demonstrate any examination or fingerprints had been conducted and simply meant that the gun had been negative for latent fingerprints.*

*The court agreed with the State's interpretation and held that the evidence did not warrant the argument attempted by the Defense attorney. The court affirms that holding today and hereby denies the motion for new trial.*

*The court finds again that the evidence, State's Exhibit 1B simply does not warrant the argument attempted by the Defense in this case, that fingerprints from Mr. Washington were compared to fingerprints recovered from the gun and found to be negative* and that there was a sole comparison of fingerprints from the gun to known fingerprints of Mr. Washington.

The evidence simply does not warrant this argument. *The plain reading of State's Exhibit 1B is that the gun was processed for latent prints with negative results meaning no latent prints were found on the gun.* (Emphasis added.)

### DISCUSSION

### I.

In a series of related contentions, appellant claims that the trial court abridged his constitutional right to present "fair and reasonable closing argument to the jury" by preventing defense counsel from arguing that the test for fingerprints on

the firearm was "negative" for appellant's fingerprints. He maintains that counsel's argument was a proper interpretation of the record; that it was "invited" by the prosecutor's erroneous characterization of the evidence (by which the prosecutor argued that firearms seldom yield fingerprints); and that the trial judge overstepped her bounds by resolving the competing factual inferences in favor of the State.

According to appellant, "the jury was deprived [of] the ability to assess appellant's guilt based on all the facts available, as key and relevant information was excluded from the jury's plenary consideration, ensuring only the State's version of events was put before the jury." He asserts:

Reversible error occurred when the trial judge sustained the State's objection during closing argument, interrupted defense counsel, disallowed the defense from submitting their competing, reasonable interpretation of one of the State's exhibits to the jury, and instructed the jury to disregard the defense argument. In so doing, the trial court deprived appellant of his right to unfettered, uninhibited, and robust argument before the jury, precluded appellant from fairly and directly responding to the State's interpretation of that item of evidence, and impermissibly denied the jury their exclusive ability to weigh and assess the evidence, and derive whatever inferences they deign reasonable.

In addition, appellant maintains that the "defense has the right to alert [the] jury to failings" in the State's case "by identifying holes in the State's evidentiary edifice." He insists that it was "patently inappropriate" for the court to preclude the defense "from submitting their interpretation of the evidence because the Court 'agree[s] with the State's interpretation' of that evidence...." Appellant continues: "It cannot be questioned that the defense was engaged in proper arguments when it sought to argue to the jury that the absence of a positive fingerprint match on the handgun-the 'negative' result of the fingerprint analysis—militated in favor of acquit-

tal. Therefore, the trial court erred in failing to permit the defense to submit the argument to the jury."

In appellant's view, the court

took dead aim at the defense's interpretation of the negative latent fingerprint results in evidence-that the gun was tested for appellant's fingerprints, and the test came back "negative"-and over defense objection told the jury to disregard the argument and not consider it for any purpose. (T1. 121; App. 7) Thus, the trial judge impermissibly identified one inference to be derived from the facts, and excluded it from the jury's consideration. The judge therefore intruded upon, and denied the jury, their role to be the exclusive arbiter of the inferences derived from the evidence. This violated Article 23 of the Declaration of Rights, and compels reversal.

Further, appellant asserts:

A trial judge may not grant the State a monopoly in the marketplace of ideas. Experience has long taught that the truth may often lie between the two competing versions thereof offered by parties to litigation. It is the role of the jury, as neutral lay fact-finders, to assess the competing interpretations offered by the party and deign the truth.

The State responds that the trial judge correctly determined that "defense counsel had no basis for arguing that the evidence showed that fingerprints taken from the gun did not match Washington's prints," because "[n]o evidence existed to indicate that *any* fingerprints were taken off the gun." In its view, the trial court "properly exercised its discretion to bar defense counsel from arguing about 'facts not in evidence.'" Similarly, argues the State, the court's subsequent instruction to the jury to disregard the statement by defense counsel regarding fingerprints was an appropriate exercise of discretion.

Further, the State disputes appellant's contention that the defense argument was an " 'invited response' to the prosecutor's allegedly impermissible argument regarding the absence of fingerprint evidence." It points out that appellant failed to

object to the prosecutor's explanation that "the absence of fingerprints on the gun was due to the nature of the surface of the gun."

## II.

▮ The right to counsel entails the opportunity to present closing argument. *See Holmes v. State,* 333 Md. 652, 658–59, 637 A.2d 113, (1994) (" 'It is well settled that a criminal defendant's Sixth Amendment right to counsel guarantees, in part, an opportunity of counsel to present closing argument at the close of the evidence.' ") (citation omitted); *see also Cherry v. State,* 305 Md. 631, 636, 506 A.2d 228 (1986); *Biglari v. State,* 156 Md.App. 657, 673, 847 A.2d 1239, *cert. denied,* 382 Md. 686, 856 A.2d 723 (2004). In *Yopps v. State,* 228 Md. 204, 207, 178 A.2d 879 (1962), the Court explained:

The Constitutional right of a defendant to be heard through counsel necessarily includes his right to have his counsel make a proper argument on the evidence and the applicable law in his favor, however simple, clear, unimpeached, and conclusive the evidence may seem, unless he has waived his right to such argument, or unless the argument is not within the issues in the case, and the trial court has no discretion to deny accused such right.

▮ To be sure, "attorneys are afforded great leeway in presenting closing arguments to the jury." *Degren v. State,* 352 Md. 400, 429, 722 A.2d 887 (1999). *See Smith v. State,* 388 Md. 468, 880 A.2d 288 (2005); *Trimble v. State,* 300 Md. 387, 405, 478 A.2d 1143 (1984), *cert. denied,* 469 U.S. 1230, 105 S.Ct. 1231, 84 L.Ed.2d 368 (1985). In *Herring v. New York,* 422 U.S. 853, 862, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975), the Supreme Court addressed the importance of closing argument:

It can hardly be questioned that closing argument serves to sharpen and clarify the issues for resolution by the trier of fact in a criminal case. For it is only after all the evidence is in that counsel for the parties are in a position to present their respective versions of the case as a whole.

Only then can they argue the inferences to be drawn from all the testimony, and point out the weaknesses of their adversaries' positions. And for the defense, closing argument is the last clear chance to persuade the trier of fact that there may be reasonable doubt of the defendant's guilt. *See In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 [1970].

The very premise of our adversary system of criminal justice is that partisan advocacy on both sides of the case will best promote the ultimate objective that the guilty be convicted and the innocent go free.

The Court of Appeals outlined the contours of permissible summation in the seminal case of *Wilhelm v. State*, 272 Md. 404, 412–13, 326 A.2d 707 (1974) (citations omitted):

As to summation, it is, as a general rule, within the range of legitimate argument for counsel to state and discuss the evidence and all reasonable and legitimate inferences which may be drawn from the facts in evidence; and such comment or argument is afforded a wide range. Counsel is free to use the testimony most favorable to his side of the argument to the jury, and the evidence may be examined, collated, sifted and treated in his own way. Moreover, if counsel does not make any statement of fact not fairly deducible from the evidence his argument is not improper, although the inferences discussed are illogical and erroneous. Generally, counsel has the right to make any comment or argument that is warranted by the evidence proved or inferences therefrom; the prosecuting attorney is as free to comment legitimately and to speak fully, although harshly, on the accused's action and conduct if the evidence supports his comments, as is accused's counsel to comment on the nature of the evidence and the character of witnesses which the [prosecution] produces. . . .

While arguments of counsel are required to be confined to the issues in the cases on trial, the evidence and fair and reasonable deductions therefrom, and to arguments of opposing counsel, generally speaking, liberal freedom of speech should be allowed. There are no hard-and-fast

limitations within which the argument of earnest counsel must be confined-no well-defined bounds beyond which the eloquence of an advocate shall not soar. He may discuss the facts proved or admitted in the pleadings, assess the conduct of the parties, and attack the credibility of witnesses. He may indulge in oratorical conceit or flourish and in illustrations and metaphorical allusions.

Nevertheless, there are limitations as to proper argument. The Court said, *id.* at 413, 326 A.2d 707:

As a limitation upon the general scope of permissible closing argument this Court in *Esterline v. State,* 105 Md. 629, 66 A. 269 (1907), cautioned that counsel should not be permitted by the court, over proper objection, to state and comment upon facts not in evidence or to state what he could have proven. Persistence in such course of conduct may furnish good grounds for a new trial. The conduct of the trial must of necessity rest largely in the control and discretion of the presiding judge and an appellate court should in no case interfere with that judgment unless there has been an *abuse of discretion* by the trial judge of a *character* likely to have injured the complaining party.

As we have seen, appellant maintains that his counsel's proposed summation with respect to the negative fingerprint results constituted a plausible interpretation of the report. The theory of the defense was that the latent fingerprint test was conducted to confirm or rule out the presence of *appellant's* latent fingerprints, with "negative" test results for appellant's prints. In appellant's view, it was not the role of the court to interpret the report and conclude that it meant that no latent fingerprints whatsoever were recovered.

Conversely, the State contends that the proposed argument was improper because there was no evidence of the recovery of any fingerprints from the weapon. It trumpets the testimony of Officer Thompson, who stated that "[n]o prints could be lifted off the weapon." Then, in its closing argument, the State suggested that no prints could be recovered from the gun because of the nature of the surface of the weapon. Thus,

the State insists that the trial court properly determined that the test results set forth in the report necessarily meant that the weapon was completely negative for all prints; the test results were not limited to the presence or absence of *appellant's* fingerprints. Claiming that the defense's closing argument was at odds with the evidence, the State contends that the court properly limited defense counsel's summation.

In our view, there was no factual basis for the trial judge to declare, one way or the other, what the text of the report definitively meant, or to determine that the test yielded results that were negative for both appellant as well as the officers who also handled the firearm. We explain.

As indicated, the report contained only appellant's name, and stated that the test results for latent fingerprints were "negative," without further explanation. Notably, the State never called the examiner to establish the exact meaning of the words used in the report. In our view, the report was ambiguous; it gave rise to conflicting inferences. By stating that the test for latent prints was "negative," the report could have meant that no prints at all were recovered, or it could have meant that the weapon was analyzed for appellant's prints, with negative results as to him.

Moreover, Officer Thompson's testimony that "[n]o prints could be lifted off the weapon" was not clear. He could have meant that no prints could be lifted from the weapon, perhaps because of the nature of the surface of the gun. Yet, if the weapon could not yield fingerprints, as the State claims, the jury surely was left to wonder why the gun was even processed. Thompson also could have meant that no prints could be lifted because, for some unspecified reason, there were none to lift. Or, Thompson could have meant that the examiner looked for appellant's prints, but there were none, and thus none could be lifted.

Nor did Thompson's testimony resolve the ambiguity in the text of the report; he did not answer the basic question whether the fingerprint analysis failed to detect appellant's prints only or, instead, prints from all sources. In addition,

Thompson was not offered as an expert, and did not explain, as the State argued in closing, that the gun surface was the kind that is not susceptible to fingerprint examination.

Significantly, the State does not cite any authority for the proposition that lay jurors would be in a position to determine whether latent prints were recoverable from the surface of the gun in issue. Indeed, several cases suggest that expert evidence is necessary to make the point that the State advanced. For example, in *Wise v. State*, 132 Md.App. 127, 136, 751 A.2d 24, *cert. denied*, 360 Md. 276, 757 A.2d 811 (2000), the prosecution offered the testimony of an expert witness who "testified at length about fingerprinting and the difficulties of obtaining fingerprints from gel capsules and vials." In *United States v. Burdeau*, 168 F.3d 352, 357 (9th Cir.), *cert. denied*, 528 U.S. 958, 120 S.Ct. 388, 145 L.Ed.2d 303 (1999), the government, over objection, "elicited testimony that identifiable fingerprints are almost never found on guns and only rarely found on other objects submitted for testing." In response to Burdeau's challenge to this testimony on direct appeal from his convictions for robbery and use of a handgun in the commission of a felony, the Ninth Circuit stated that it has "in the past upheld the admission of expert testimony that explained the possible reasons why fingerprints would not be found on an object." *Id.* at 357 (citing *United States v. Christophe*, 833 F.2d 1296, 1300 (9th Cir.1987) and *United States v. Feldman*, 788 F.2d 544, 554–55 (9th Cir.1986)). *See also United States v. Carpenter*, 403 F.3d 9, 10 n. 1 (1st Cir.) (noting that to meet defense argument about lack of fingerprints, "the government adduced expert testimony to the effect that it is exceedingly difficult to lift viable fingerprints from the surfaces of this particular weapon."), *cert. denied*, 544 U.S. 1042, 125 S.Ct. 2284, 161 L.Ed.2d 1076 (2005).

Therefore, we agree with appellant that the court made "an impermissible decision of what was, and was not the ... inference to be drawn from the evidence presented." As appellant posits, "The trial judge is not the arbiter of which arguments are, and are not, logical, correct, or the more

available. It is not the role of the trial judge to assess which of two competing interpretations of a piece of evidence is the better one, and deny the defense the opportunity to submit their interpretation of the evidence...."

If the "negative" result of the fingerprint test was ambiguous, the question remains as to whether defense counsel should have been allowed to argue that the fingerprint analysis yielded "negative" results for *appellant's* prints. Given the failure of the prosecution to introduce foundational evidence that the test was negative in all respects, and its failure to adduce expert testimony to establish that no latent fingerprints could be recovered because of the nature of the gun's surface, the defense's theory as to the meaning of the report was just as plausible as the State's, and defense counsel should have been permitted to so argue.

Several cases shed light on the question of whether appellant's argument should have been permitted. We begin with *Eley v. State*, 288 Md. 548, 419 A.2d 384 (1980).

In *Eley*, the defendant was convicted for assault with intent to murder and robbery with a deadly weapon. He claimed on appeal that the trial court erred by refusing to permit defense counsel to comment during summation on the lack of any fingerprint evidence.

Eley was prosecuted for shooting Gary Johnson. *Id.* at 549, 551, 419 A.2d 384. After the shooting, the assailant stole an automobile and fled the scene. Ms. Jones, the driver of the car the assailant used to escape, was a witness. But, the State "neither listed nor presented any witnesses to discuss whether fingerprint tests had been performed on the Jones vehicle." *Id.* at 550, 419 A.2d 384.

In his summation, defense counsel sought to point out the "evidence that didn't exist[.]" Judge Cole's opinion for the Court outlined what happened at trial, *id.* at 550–51, 419 A.2d 384:

[MR. BELSKY]: We talked about the testimony of the Dorseys. We talked about all this testimony that was in.

Let's talk about the evidence that didn't exist, that didn't happen. We talk about—

THE COURT: You are treading on some dangerous ground, Mr. Belsky. We can be here for three months talking about what didn't happen.

[MR. BELSKY]: Well, Your Honor–Your Honor, I want to—

THE COURT: You are not going to get a chance to talk about what didn't happen. You must confine yourself to the arguments-your arguments about the evidence that existed. At the conclusion of defense argument counsel requested to approach the bench and made the following objection:

[MR. BELSKY]: Your Honor please—

THE COURT: Yes sir.

[MR. BELSKY]:—I believe it is proper evidence to go into a proper closing argument to go into there was no fingerprint evidence done to the car. I think that's covered in your instructions and I would like to note my objection on the record.

THE COURT: I don't think it is proper evidence to argue what wasn't. And you got your objection on the record and your objection is duly noted and your objection is overruled.

On appeal, Eley maintained that the trial judge "improperly precluded counsel from arguing the logical inferences from the facts and the *gaps* in that evidence." *Id.* at 551, 419 A.2d 384 (emphasis in original). The Court of Appeals agreed that the court erred by prohibiting defense counsel from commenting on the unexplained absence of fingerprints. *Id.* The Court recognized " 'that counsel should not be permitted by the court, over proper objection, to state and comment upon facts not in evidence or to state what he could have proven.' " *Id.* (quoting *Wilhelm,* 272 Md. at 413, 326 A.2d 707). However, in reviewing "the purposes and application of this limitation," *id.*, the Court concluded that the trial court erred "in finding the limitation applicable to the case at bar.[ ]" *Id.* It said:

The broad purpose of the rule is to prevent counsel for either the prosecution or the defense from attempting to

introduce to the jury matters which ought not to be considered in arriving at a determination of guilt or innocence.

\* \* \*

The rule [prohibiting argument based on facts not in evidence] is designed also to prevent counsel from suggesting evidence which was not presented at trial thereby providing additional grounds for finding a defendant innocent or guilty. *See United States v. Garza,* 608 F.2d 659, 663 (5th Cir.1979). Enforcement of the rule prevents abuses such as where the prosecutor may merely intimate that he knows of additional evidence of defendant's guilt which he did not present during his case, ... or where the prosecutor expressly argues that certain events did or did not happen when there is no evidence in the record to support such statements.

\* \* \*

Perhaps a more cogent reason for enforcing the rule is that arguments of counsel which are outside the record are improper because they allude to sources which are not subject to cross examination and cannot be tested for reliability. Permitting such arguments denies the defendant the right to confront his accusers.

*Id.* at 552–53, 419 A.2d 384 (citations omitted).

The Court concluded:

We agree that, where there is *unexplained* silence concerning a routine and reliable method of identification especially in a case where the identification testimony is at least subject to some question, it is within the scope of permissible argument to comment on this gap in the proof offered.[ ] Here, Eley sought to argue that the State had a reliable method of proving he was the assailant by introducing evidence of his fingerprints on the car. Since the State did not explain its failure to do so, **he sought to establish the adverse inference, through argument of counsel, that his fingerprints were not on the car and, therefore he was not at the scene. This seems to us to be permissible argument** particularly in light of the fact that Ms. Jones

could not identify him as her assailant and that other witnesses may have been regarded as biased by the jury because of their relation to Johnson.

*Id.* at 555–56, 419 A.2d 384 (italics in *Eley*; boldface added).

*Sample v. State,* 314 Md. 202, 550 A.2d 661 (1988), is also instructive. Sample was convicted of wearing, carrying, or transporting a handgun in a public place. A police officer stopped the automobile in which Sample had been riding. The officer went to the front passenger side door and ordered Sample out of the vehicle. Sample "held a three-quarter length leather coat draped over his arm" and, after he took a step toward the officer, turned and fled on foot. *Id.* at 205, 550 A.2d 661. During the pursuit, officers saw Sample's right arm move upward and saw a handgun "hit the street." *Id.*

At trial, Sample's defense counsel took aim at "the holes in the State's case." *Id.* at 206, 550 A.2d 661. He told the jury in his opening statement that they "would hear evidence that the State could have taken fingerprints[.]" *Id.* His closing argument, in which he attempted to exploit the lack of fingerprint evidence, was foreclosed after the prosecutor objected. Sample challenged that ruling on appeal. We affirmed, but the Court of Appeals reversed. It rejected the State's argument that *Eley* was inapposite. *Id.* at 204, 550 A.2d 661. Declining to apply *Eley* "so narrowly," the Court said, *id.* at 208–09, 550 A.2d 661:

Even though Officer Allen's testimony was not directly contradicted by another witness, that does not mean it was unchallenged. By his cross-examination of the officer, and in his opening statement as well as his closing argument, Sample's attorney made it abundantly clear that he was challenging Officer Allen's assertion that a gun had been dropped by Sample, or that any bullets were found in a coat pocket, or that if bullets were so found, the coat was shown to have been Sample's. The jury was under no obligation to believe every fact testified to by Officer Allen, even though his testimony was not directly refuted by another witness. We may think the State's evidence was quite strong, as did

the trial judge, but it is the jury who must evaluate the officer's credibility and determine what actually occurred. Under the circumstances, *we conclude that Sample should have been permitted to comment upon the unexplained[ ] absence of fingerprint evidence.*

\* \* \*

*The prohibition of comment on the absence of fingerprint evidence in this case was error, and we reverse.* (Emphasis added.)

The Court added, *id.* at 209 n. 2, 550 A.2d 661:

We do not suggest that the explanation [that fingerprints were not discovered on an item] must always be explicit in order to justify limitation of argument. When the surface supposedly touched is such that a trial judge may judicially notice the fact that fingerprints could not be obtained from it, and the record demonstrates the basis for the judge's decision, a defendant may be precluded from arguing that an inference of favorable fingerprint evidence may be drawn from the State's failure to introduce any fingerprint evidence. Even in such a case, however, the defendant would not be precluded, in arguing the meaning of proof beyond a reasonable doubt, from generally contrasting the quality of fingerprint evidence or other highly reliable evidence with the quality of the evidence presented in the case.

*United States v. Hoffman,* 296 U.S.App.D.C. 21, 964 F.2d 21 (D.C.Cir.1992) (per curiam), is also noteworthy. There, the two defendants were convicted of narcotics offenses. Amtrak agents had discovered and seized narcotics from their luggage, but the items were not tested for fingerprints. On appeal to the United States Court of Appeals for the District of Columbia, the defendants asserted that the trial court erred by preventing defense counsel from arguing to the jury that it should "draw various adverse inferences" from the government's failure to introduce fingerprint evidence. *Id.* at 24. The appellate court disagreed.

The court distinguished *Eley,* on which the appellants relied. It said, *id.* at 25:

We think that *Eley* may be distinguishable from the case at bar, because it appears that the defense lawyer's argument in that case was limited to the contention that the absence of fingerprint evidence weakened the prosecution's case against his client-an argument that the Government concedes to be appropriate. However, as Appellants point out, some of the language in *Eley* seems to go further, suggesting that the kinds of inferences urged by Hoffman's counsel in this case would be permissible even in the absence of any evidentiary foundation. *See Eley*, [288 Md. at 553, 419 A.2d 384] (suggesting that unexplained absence of fingerprint evidence "permit[s] the adverse inference that the evidence would have been unfavorable to the State"). To the extent that *Eley* so holds, we part company with the Maryland Court of Appeals[.]

To be sure, the D.C. Circuit recognized that defense counsel "must be permitted to argue all reasonable inferences from facts in the record[,]" including "negative inferences." *Id.* at 24. But, the court cautioned that " 'counsel may not premise arguments on evidence that has not been admitted.' " *Id.* (quoting *Johnson v. United States*, 347 F.2d 803, 805 (D.C.Cir. 1965)).

In our view, *Hoffman* is distinguishable from the case *sub judice* because there was no evidence in *Hoffman* that the government had tested the contraband for fingerprints. It was on that basis that the appellate court upheld the trial court's refusal to permit the argument sought by the defense. The court explained, 964 F.2d at 25 (footnote omitted):

... Hoffman's attorney moved from arguing fair inferences from the record to arguing the existence of facts *not* in the record-*viz.*, that the police did not look for fingerprints, that fingerprints could have been obtained from the plastic bags containing the narcotics and that standard police procedure required fingerprint analysis. Because neither defense attorney had laid any evidentiary foundation for those assertions-by, for example, asking one of the officers on cross-examination whether the plastic bags were (or could have been) tested for fingerprints, and whether standard proce-

dure required such testing-Hoffman's argument was improper.[1] Accordingly, we hold that the District Court did not err, much less abuse its discretion, in refusing to permit the argument.

*United States v. Poindexter,* 942 F.2d 354 (6th Cir.), *cert. denied,* 502 U.S. 994, 112 S.Ct. 615, 116 L.Ed.2d 637 (1991), *amended on other grounds sub nom. United States v. Day,* 956 F.2d 124 (6th Cir.1992), is also pertinent. Co-defendants Day and Poindexter were convicted of possession with intent to distribute cocaine and use of a firearm in a drug trafficking scheme. They challenged the trial court's preclusion of closing argument on the lack of fingerprint evidence. The Sixth Circuit awarded Day a new trial but affirmed Poindexter's convictions. The distinction in the dispositions reflected the strength of the government's case against each.

During closing argument, Day's attorney pointed out that a police officer had testified that a shaving can, in which cocaine had been found, had been dusted for fingerprints. The trial court sustained the government's objection to this summation, explaining that " '[f]ingerprint evidence can only be introduced by an expert [who could] explain ... the science, the identification by fingerprints' and that an absence of fingerprint evidence did not 'prove anything.' " *Poindexter,* 942 F.2d at 358.[4]

---

**4.** This issue unfolded when Day's attorney addressed the lack of fingerprint evidence during closing argument, stating: "Well, the next logical question that I pose to you, ladies and gentlemen of the jury is, whose fingerprints were found on that can?" *Id.* at 359. The court sustained the government's objection, stating, *id.*:

> Let me just explain to the jury about fingerprints. Fingerprint evidence can only be introduced by an expert, and the expert would explain to you the science, the identification by fingerprints. So, it is improper to argue the absence of fingerprints proves anything. This should not be done. You certainly don't have any evidence to establish that fingerprints proved either of these defendants had anything to do with it, but [Day's counsel] is out of line when he argues that holds that up and says that you haven't proved my client guilty because there are no fingerprints. The expert will tell you that that isn't conclusive.

On appeal, Day argued, *inter alia,* that the trial court erred by foreclosing his closing argument on the fingerprint issue. Of import here, the Sixth Circuit agreed, stating:

> In every criminal case, the mosaic of evidence that comprises the record before a jury includes both the evidence *and* the lack of evidence on material matters. Indeed, it is the absence of evidence upon such matters that may provide the reasonable doubt that moves a jury to acquit. The legitimacy of the inference Day's counsel wished to bring to the jury's attention-the absence of evidence of Day's fingerprints on an article containing contraband that had been dusted for fingerprints and which Day was charged with possession-did not depend upon the conclusiveness of the inference. Neither did it depend upon the necessity that it "prove anything," merely that it had the tendency to do so. Fed.R.Evid. 401. We think the court's refusal to permit the argument was an abuse of discretion.

*Id.* at 360. *Accord, United States v. Thompson,* 37 F.3d 450, 453 (9th Cir.1994).

*State v. Loyal,* 386 N.J.Super. 162, 899 A.2d 1009 (App.Div.), *cert. denied,* 188 N.J. 356, 907 A.2d 1015 (2006), is also helpful. After Loyal was convicted of aggravated manslaughter and related offenses, he appealed to the New Jersey intermediate appellate court. He challenged the trial court's admonition that the jury must disregard defense counsel's closing statement that the prosecution failed to prove the offenses beyond a reasonable doubt because there was no evidence that tied Loyal to the murder weapon.

---

At a bench conference following the ruling, defense counsel contended that it was indeed proper for him to argue that if the fingerprints had belonged to his client, the prosecution likely would have brought out that information. The court responded, *id.*:

> Don't you realize that that's an unfair statement? You know that there could be no fingerprints on there, and it didn't prove that your client didn't handle them. I don't want you to get into that. That's not fair. That's below the belt for you defense lawyers to do it.... That's not a search for the truth. That's just trying to fudge on the rules. You ought to be reprimanded for it.

The appellate court reversed. Agreeing with the Court's decision in *Eley, supra,* 288 Md. 548, 419 A.2d 384, it said:

The right to comment on the lack of fingerprint evidence is, of course, not without limits. Thus, without evidence to support the contention, defendant cannot argue that the failure to obtain fingerprints did not comply with good police practice, or that if fingerprints had been obtained, they would have exculpated defendant. . . . We concur with the views expressed by the Maryland Court of Appeals, that if "the State fail[s] to produce [fingerprint] evidence and fail[s] to offer any explanation for that failure . . . it is not unreasonable to allow the defendant to call attention to its failure to do so." *Eley, supra,* 419 A.2d at 387.

\* \* \*

We do not mean to suggest, on the other hand, that the trial court is, absent objection, powerless to intervene in the face of a clearly improper argument or question.

\* \* \*

Having concluded that defense counsel's remarks were proper, we must face whether the trial court's actions can be deemed harmless. There is "no mathematically precise formula for deciding whether a trial error creates a reasonable doubt that would not otherwise have existed concerning defendant's guilt." . . . In our judgment, the error cannot be deemed harmless.

\* \* \*

While it is entirely possible the jury could reach the same result if defense counsel had been permitted to make his argument without the impact of the trial court's curative instruction, we cannot conclude that the error here did not have the capacity to lead the jury "to a result it otherwise might not have reached." . . . We thus reverse defendant's convictions and remand the matter for a new trial. It is unnecessary to address defendant's remaining contentions.

*Loyal,* 899 A.2d at 1016–18 (citations omitted). *Cf. Wheeler v. United States,* 930 A.2d 232, 242, 245 (D.C.2007) (trial court erred by instructing the jury that the "absence of any finger-

print evidence, standing alone, does not constitute reasonable doubt as to the firearm charges," explaining that the instruction was erroneous because it "was contrary to the elemental premise that a critical assessment of that evidence [the lack of fingerprints] was for the jury ... to make[.]")

We conclude that the trial court erred by drawing the inference from the report that the fingerprint test was negative for all latent prints. In doing so, it invaded the province of the jury to evaluate and construe the evidence. It follows that the court abused its discretion when it foreclosed appellant's closing argument with respect to the defense's interpretation of the report. As the Court said in *Wilhelm,* 272 Md. at 412, 326 A.2d 707:

Counsel is free to use the testimony most favorable to his side of the argument to the jury, and the evidence may be examined, collated, sifted and treated in his own way. Moreover, if counsel does not make any statement of fact not fairly deducible from the evidence his argument is not improper, although the inferences discussed are illogical and erroneous.

Therefore, we shall vacate appellant's convictions and remand for a new trial.

In view of our disposition, we need not address whether the court erred in its instruction to the jury to disregard defense counsel's argument. Nor need we consider appellant's contention that counsel's summation was an "invited response" to the prosecutor's explanation as to why no fingerprints were on the weapon. Finally, we shall not address whether the trial court plainly erred when it permitted the prosecutor to cross-examine appellant by asking three "were they lying" questions.

### III.

For the guidance of the trial court in the event of a new trial, we will briefly address the contention that the trial court abused its discretion by forbidding cross-examination of the State's law enforcement witnesses with respect to their

assignment to the Baltimore City Southwest District FLEX Squad.

The "FLEX unit is a plain clothes squad within the Baltimore City Police Department that responds to varying locations during different time periods depending on crime trends." *Spain v. State,* 386 Md. 145, 148 n. 1, 872 A.2d 25 (2005). *See Ransome v. State,* 373 Md. 99, 119, 816 A.2d 901 (2003). The Southwest District FLEX Squad was the subject of scrutiny after a woman claimed that she had been raped in the FLEX Squad office. *See Smith v. Danielczyk,* 400 Md. 98, 106, 928 A.2d 795 (2007). In the process of investigating the assault, controlled dangerous substances were located in the offices of the FLEX Squad. *Id.*[5]

On the second day of trial, the prosecutor made an oral motion *in limine* requesting an order to curtail any inquiry by the defense into the assignments of the law enforcement prosecution witnesses with the FLEX Squad. The following exchange is relevant:

[PROSECUTOR]: Your Honor, I wanted to basically do a motion in limine to prevent any more—any further questions regarding the Southwest District FLEX Unit or any other questions that possibly could come up in cross-examination or in the closing argument of defense counsel with respect to the Southwest District FLEX Unit investigation and also with respect to any sort of initiative that Commis-

---

**5.** In his brief, appellant cites three newspaper articles that appeared in the *Baltimore Sun,* which purport to detail improprieties and improper activities involving the FLEX Squad. He has not requested that we take judicial notice of the contents of the articles, however. Although it has been held that a court is not required to take judicial notice of newspaper articles, *see United States v. Rutgard,* 116 F.3d 1270, 1278 (9th Cir.1997), there is authority to the contrary. *See Washington Post v. Robinson,* 935 F.2d 282, 291 (D.C.Cir.1991) (stating "court may take judicial notice of the existence of newspaper articles in the Washington, D.C., area that publicized" ongoing criminal investigation of local politician.) (citing *Agee v. Muskie,* 629 F.2d 80, 81 n. 1, 90 (D.C.Cir. 1980), *rev'd on other grounds,* 453 U.S. 280, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981)). In view of the disposition of this appeal, we need not note the substance of the *Baltimore Sun* articles.

sioner Hamm had or anything that doesn't pertain to this particular case with respect to investigations.

THE COURT: [Defense Counsel]?

[DEFENSE COUNSEL]: (inaudible) credibility of the officers as far as the directive by Commissioner Hamm. That is public—that's public record. I think this door was opened up by counsel when he mentioned about—in his questioning about the officers getting—if there was a quota or if there were bonuses.

THE COURT: He did not ask about quotas. He asked if there were any bonuses or promotions. He did not ask about any quotas.

[DEFENSE COUNSEL]: Maybe my notes are incorrect, Your Honor. I have—

THE COURT: Did you ask about quotas?

[PROSECUTOR]: The questions that I asked about quotas came in my redirect. The first question asked in cross-examination of Officer Thompson was whether or not he knew that the—if he was a member of the Southwest District FLEX Unit that was under investigation.

THE COURT: Well, there are two issues with respect to the motion in limine, the investigation of the FLEX Unit and the introduction or cross-examination with respect to any quotas set by Commissioner Hamm. Do you wish to be heard?

[DEFENSE COUNSEL]: Yes, Your Honor. As far as— that's the officer's patrol there. I don't have a problem with not mentioning anything about if they're under investigation, but the officer indicated that he was a member of the Southwest FLEX Unit. That's what his assignment is.

THE COURT: All right. The fact that the Southwest FLEX Unit may be under investigation is not relevant in any way to any of the issues in this trial. There is no factual information that has been proffered to this Court that either of the officers who testified are themselves personally under investigation. Even if they were, certainly a full hearing to determine the probative value of that

information as it would pertain to the individual officers, which does not exist, versus the prejudicial nature of that information would be necessary. To simply ask the officers whether they are part of a unit that is under investigation by some law enforcement authority is impermissible. The motion in limine is granted with respect to that, as were any objections made by the State sustained by the Court.

 Cross-examination is a "right guaranteed by the common law." *Myer v. State,* 403 Md. 463, 476, 943 A.2d 615 (2008). Further, the "Sixth Amendment right of confrontation includes the right to cross-examine about matters that affect a witness's bias, interest, or motive to lie." *Leeks v. State,* 110 Md.App. 543, 554, 678 A.2d 80 (1996). *See* Md. Rule 5–616.[6] *See, e.g., Churchfield v. State,* 137 Md.App. 668, 682–83, 769 A.2d 313 (2001) (stating that cross-examination with respect to potential bias is " 'the most important impeachment technique because "even an untruthful man will not usually lie without a motive." ' ") (quoting Joseph F. Murphy, Jr., *Maryland Evidence Handbook* § 1302(E) (2d ed. 1993) (in turn quoting *Gates v. Kelley,* 15 N.D. 639, 110 N.W. 770, 773 (N.D.1906))). As Judge Gilbert wrote for this Court in *Deinhardt v. State,* 29 Md.App. 391, 397, 348 A.2d 286 (1975), *cert. denied,* 277 Md. 736 (1976), "[t]he opinion of the majority in *Davis [v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974)] makes clear that the refusal to allow the defense to demonstrate bias on the part of the prosecutor's principal witness through cross-examination is a denial of Due Process under the Fourteenth Amendment as well as an infringement upon [the defendant's] Sixth Amendment rights."[7]

---

**6.** Rule 5–616(a) governs "impeachment by inquiring of a witness," and provides:

The credibility of a witness may be attacked through questions asked of a witness, including questions that are directed at:

\* \* \*

(4) Proving that the witness is biased, prejudiced, interested in the outcome of the proceeding, or has a motive to testify falsely[.]

**7.** The Sixth Amendment is made applicable to the States via the Fourteenth Amendment. *Pointer v. Texas,* 380 U.S. 400, 403, 85 S.Ct.

■ Although appellant does not proclaim that these partic-ular members of the FLEX Squad were biased, the thrust of his argument is that the jury was entitled to assess their credibility in light of the "infamous" reputation of the FLEX Squad. The "cross-examination of a government 'star' witness is important, and a presumption favors free cross-examination by a defendant of possible bias[.]" *United States v. Novaton,* 271 F.3d 968, 1006 (11th Cir.2001) (citation omitted), *cert. denied,* 535 U.S. 1120, 122 S.Ct. 2345, 153 L.Ed.2d 173 (2002). *See generally United States v. Abel,* 469 U.S. 45, 52, 105 S.Ct. 465, 83 L.Ed.2d 450 (1984). Thus, "the absolute preclusion of cross-examination pertaining to a witness's motive for testify-ing would be an abuse of discretion[,]" especially when the defense seeks to cross-examine the prosecution's key witness. *Leeks v. State,* 110 Md.App. at 554, 678 A.2d 80 (citations omitted).

■ The Court of Appeals instructs that "trial courts retain wide latitude in determining what evidence is material and relevant, and to that end, may limit, in their discretion, the extent to which a witness may be cross-examined for the purpose of showing bias [or other disqualifying factors]." *Merzbacher v. State,* 346 Md. 391, 413–14, 697 A.2d 432 (1997) (citations omitted). But, it is also clear that "a cross-examiner must be given wide latitude in attempting to establish a witness' bias or motivation to testify falsely." *Id.* (citations omitted)

■ We turn to the requirement that the defense establish a foundation or basis for the cross-examination. The trial court in this instance did not abuse its discretion in forbidding the "FLEX Squad" cross-examination because, as conceded by appellant, no proffer was tendered. We note that the "Con-frontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might

---

1065, 13 L.Ed.2d 923 (1965). *See Merzbacher v. State,* 346 Md. 391, 411–12, 697 A.2d 432 (1997).

wish." *Delaware v. Fensterer,* 474 U.S. 15, 20, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985) (per curiam).

Thus, in the event of a retrial, the defense must articulate how a *particular* witness's assignment to the Southwest District FLEX Squad would jeopardize his credibility with respect to the case at hand. The defense must also make an appropriate proffer with respect to the witness's participation in the FLEX Squad activities. In the final analysis, the defense must make a proper showing that evidence regarding a witness's assignment to the FLEX Squad is both relevant and material.

**JUDGMENTS OF CONVICTION VACATED; CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR FURTHER PROCEEDINGS.**

**COSTS TO BE PAID BY THE MAYOR AND CITY COUNCIL OF BALTIMORE.**