966 A.2d 925

**Robert HARRIS**

v.

**STATE of Maryland.**

**No. 65, Sept. Term, 2008.**

Court of Appeals of Maryland.

March 9, 2009.

---

504

Deborah S. Richardson, Asst. Public Defender (Nancy S. Forster, Public Defender, Baltimore), on brief, for Petitioner/Cross–Respondent.

Diane E. Keller, Asst. Atty. General (Douglas F. Gansler, Atty. General, Baltimore), on brief, for Respondent/Cross–Petitioner.

Argued Before BELL, C.J. HARRELL, BATTAGLIA GREENE, BARBERA, LAWRENCE F. RODOWSKY (Retired, Specially Assigned), ALAN M. WILNER (Retired, Specially Assigned), JJ.

ALAN M. WILNER, Judge, Retired, Specially Assigned.

In April, 1997, petitioner, Robert Harris, was convicted by a jury in the Circuit Court for Baltimore City of first-degree murder, conspiracy to commit murder, use of a handgun in the commission of a crime of violence, and solicitation to commit murder, for which he was sentenced, in the aggregate, to life imprisonment without parole plus 20 years consecutive. The judgments were affirmed on appeal. In this Post Conviction Act proceeding, petitioner complains that the State, in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), as refined and explicated in later cases, failed to disclose certain critical evidence relating to plea bargains entered into by two of the principal witnesses against him. The trial court, in the post conviction proceeding, found that the State had disclosed sufficient information concerning the plea bargains and that there was no *Brady* violation.

After granting Harris's application for leave to appeal that decision, the Court of Special Appeals, in an unreported opinion, concluded that the State did, indeed, withhold impeachment evidence that should have been disclosed but nonetheless affirmed the trial court order on the ground that the non-disclosure was not material—that it did not render the

verdicts unworthy of confidence and that the record did not generate a reasonable probability that a different result would have occurred had the information been disclosed. We agree with the intermediate appellate court that the information at issue was *Brady* material and was required to be disclosed; we disagree, however, with that court's conclusion that the non-disclosure was not material. We shall reverse.

## BACKGROUND

The victim in the case was Teresa McLeod, Harris's fiancé. On the evening of January 26, 1996, she and Harris were parked in Harris's car when a masked gunman approached and ordered them out of the car. After exiting the car, Ms. McLeod was shot, at close range, once in the hand and five times in the back; she died from her wounds. Harris was shot once in his left leg. The person who ordered them out of the car was Russell Brill.

The State charged that this entire event was orchestrated by Harris. It produced evidence that Harris solicited Brill to kill Ms. McLeod and make it look like a robbery, that he had given Brill the gun used in the killing and informed him of when and where the shooting was to occur, that Brill was fully prepared to carry out his assignment but, at the last moment, took pity on Ms. McLeod, who was pleading for her life, and refused to shoot her, that Harris then took the gun and shot her himself, that he then returned the gun to Brill and directed Brill to shoot him in the leg, and that Brill did so and then fled. Although more than thirty witnesses testified at trial and there was a good bit of conflicting evidence, the issue of Harris's role in what occurred and, in particular, who shot Ms. McLeod, hinged largely on the relative credibility of Harris and Brill, who told very different stories.

### *Harris's Version*

Harris testified that he moved in with Ms. McLeod and her mother and son in 1992 and that he and Ms. McLeod became engaged in September, 1995. During that period, he obtained four handguns, including a Glock 19 nine mm. gun which

proved to be the murder weapon. Concerned about having those weapons in the home with Ms. McLeod's nine-year-old son, he decided to sell them.

On January 25, 1996, the day before the murder, Harris said that he sold the Glock to Mr. Brill, whom he had met earlier that month. Brill did not have the purchase money at the time, so they arranged to meet the next evening at Violet Lil Park.[1] He and Ms. McLeod went to the park on the evening of the 26th for that purpose. While they waited in the parked car for Brill to appear, a man, whom he did not recognize but told the police was an African–American, approached, pointed a gun at him, and directed him to get out of the car, which he did. After the gunman relieved Harris of his money, he ordered Ms. McLeod out of the car and demanded her purse. She threw her purse into the air and started to run, at which point the gunman shot at her and at Harris, striking him once in the leg. Harris said that he lost sight of Ms. McLeod and initially assumed that she had escaped.

Using his cell phone, Harris called 911. While he waited for help, a bystander approached, saw Ms. McLeod lying on the ground, and advised that she was not moving, at which point Harris said he began to cry.[2] Eventually, the police arrived and found Ms. McLeod dead and Harris angry and in pain from his wound. He told them that a black male, tall, thin, and wearing a camouflage jacket and black and white pants, had robbed and shot him and Ms. McLeod. The officers observed Ms. McLeod's purse, containing about $48, near where her body lay. She was also wearing jewelry, including a Gucci watch, a gold ring with seven diamonds, a gold wedding band with four diamonds, and gold earrings. In Harris's car they discovered a magazine (bullet-holder) con-

---

1. Throughout, the transcript refers to the area and the scene of the crime as Violet Lil, a name with which this Court is unfamiliar. The city map shows the area as Violetville. We shall use the description as specified in the transcript.

2. The bystander, Robert Fink, testified that Harris was calm and started to make a "fake cry."

taining eight bullets. Harris was excited but not crying. A search of the area revealed no African–American (or any other) suspects.

### Brill's Version

Brill, who is white, testified he had met Harris about two months prior to the killing. A short time later, Harris expressed interest in having Brill sell for him a load of drugs and a case of Glock handguns, but nothing ever came of that, or of Harris's desire to buy a handgun—a Mack 11—from Brill. Near the end of December, 1995, Harris told Brill that he had a friend who was looking to have his wife killed in order to collect insurance and asked Brill to be on the lookout for a triggerman.

A few days later, Harris pursued the matter and laid out a scenario for Brill under which Brill would kill the woman as she left work—that he should "act like you're robbing her, demand her purse and her money, shoot her down, run straight down behind the building through the alley and I'll be waiting for you in the parking lot." Harris said that he would supply the weapon—a Glock 19. By the end of the conversation, the plan changed to have the killing occur early in the morning as the lady went to work, but it later reverted to an evening event. Brill agreed to perform the killing for $20,000.

The night before the killing was initially planned to occur, according to Brill, Harris gave him both the gun and some gloves to wear. Brill and a friend, Nicholas Jantz, took the gun to the site and test-fired it. He and Jantz then got high on marijuana, however, and the murder had to be postponed. Harris was angry but rescheduled the killing for January 26. On that day, he met Brill and took him to the park where the killing was to occur later in the evening, gave Brill a pager, and said that he would page Brill later to let him know when he and Ms. McLeod would be there. His instruction was that Brill was to force both of them out of the car, shoot and kill Ms. McLeod, and then shoot Harris to make it look like a robbery.

Between 8:30 and 9:00 on the 26th, Brill received the page from Harris, put on black clothes, a beany hat, a mask, and the gloves given him by Harris, proceeded to the park, and waited. When Harris arrived, he got out of the car and walked toward Brill, as though he was supposed to meet him there. Brill pulled out the gun and pretended to rob Harris. At Brill's instruction, Harris told Ms. McLeod to get out of the car, and he then backed away to the front of the car. Brill pulled a gold chain off her neck, at which point she began to cry. He then grabbed her purse as she was pleading for her life. Brill testified that she was in tears, she was terrified, "and I just looked at Rob, Robert Harris, I said man, I can't do this shit." Although saying nothing, Ms. McLeod looked as if in wonderment how the robber would know Harris's name. Brill started to back away when Harris grabbed the gun, pushed him back, turned to Ms. McLeod, and started firing. She tried to run but fell to the ground, and Harris stood over her and shot her several times. Brill said that at least one bullet hit her before she fell. At that point, Harris, visibly angry, approached Brill and pointed the gun at him. Brill grabbed the gun, took it from Harris, shot him in the leg, and then fled, discarding the necklace as he ran.

### What Happened Next

Harris was taken to the hospital for treatment of his wound. While he was there, Detective Darryl Massey interviewed him briefly and arranged for a gunshot residue test to be performed. The results of that test were negative, although the lab technician testified that, because such residue could be washed or wiped off, a negative finding did not mean that the person had not fired a gun.

In an interview conducted the next day at the police station, Harris told Detective Massey that he and Ms. McLeod were on their way to a restaurant when they got into an argument, that he pulled over to discuss the issue, and that it was while they were parked that a black male approached the passenger side of the vehicle and commenced to rob and shoot him and Ms. McLeod. Massey did not regard Harris as a suspect at

that point, and, when the interview was completed, Harris left the station.

Later that night or early the next morning, Massey received a telephone call, and, from the information related to him, which he did not describe, Massey brought Nicholas Jantz, Brill's friend, to the station for questioning. The interview took place on Sunday, January 28, and, based on Jantz's testimony in court, he informed the detective, among other things, that Brill had come to his house one evening after meeting with Harris and revealed that Harris had offered him $20,000 to murder a woman.[3] Jantz added that the murder weapon was to be a Glock 19, which Harris would supply, and that Harris "was going to take him to this woman's work and he was going to go in and sort of commit a common robbery and then shoot her, then come back out and about three blocks away, Mr. Harris was going to pick [Brill] up."

Jantz further testified, and thus presumably told Detective Massey, about subsequent contacts between Harris and Brill—that on the day of the murder he was with Brill when Harris picked them up and took them to the park and gave Brill a pager,[4] and that about a week before the murder but close to the time when it was first scheduled to occur, he saw Brill with the Glock 19 murder weapon. Jantz said that, around 8:30 on the evening of the murder, while he and Brill were together, Brill received a page from Harris and said that he had to leave. Jantz later heard the police cars and ambulance. He walked to the park and saw Harris being wheeled into the ambulance and Ms. McLeod under a sheet.

---

3. The tape-recorded statement that Jantz gave to Detective Massey is not in the record now before us. The testimony he gave at trial is in the record, and, in that testimony, Jantz said that "everything that I've said here today is the same thing I told the detectives the night I got taken into the police station."

4. There appears to be a discrepancy in Jantz's testimony regarding when Harris gave Brill the pager. At one point, he said that Harris gave Brill the pager about a week before the murder. Later, he indicated that Brill got the pager on the day of the murder.

After taking Jantz's statement, Detective Massey brought three other people in for questioning—Joseph Brill (Russell Brill's younger brother), Jennifer Pettie (Joseph Brill's fiance and mother of his two children), and Russell Brill. As with Nicholas Jantz, the statements given to the police by those three persons are not in the record now before us. Joseph Brill and Ms. Pettie, who testified, said that their testimony was no different than what they told the police.

Ms. Pettie said that, a few days before the murder was supposed to happen, Russell Brill told her that he "took a contract with someone to kill this woman." He did not reveal the name of the person with whom he had so contracted but said that it was the woman's husband and that Russell was to be paid $20,000 from an insurance policy. On the night of the murder, she was with Russell and Joseph Brill and Nicholas Jantz. She saw Russell cleaning a gun, which she later identified as the Glock 19, that Russell said he got from the husband. Around 7:30, she said, Russell's pager went off, and he said it was time to go. He returned about 10:00, shaking and crying. He told Ms. Pettie that he had shot both Harris and Ms. McLeod:

> "He said that he was hiding in the bushes by the train tracks and they pulled up in their car and he waited and then he went up and put the gun to the car and told her to give him her stuff, and she gave him her purse and he snatched her necklace off her neck, and then they were out of the car by then and he just shot her and she was begging please, don't shoot me."

Russell further stated, she said, that, with the next bullet he shot the man in the leg "because it was to look like a robbery and that is what he was told to do."

Joseph Brill reported that, about two weeks before the murder, Russell told him that "this guy Robert Harris offered him twenty thousand dollars, a couple of keys [*sic*] of cocaine and a case of guns to murder his other guy's wife for some reason or another" and said that the money was to come from an insurance policy on Teresa McLeod. Russell said at first

the murder was to happen when she was leaving work, but that changed, and it was to occur at Violet Lil Park and look like a robbery. Russell was to get the gun from Harris, go to the park, hide in the bushes, wait for Harris's signal, and make it look like a robbery. Joseph saw Russell with the gun three days before the murder and again on the day of the murder.

Joseph said that Russell got the page around 9:30, and that he then left. He returned about two hours later, nervous and crying, removed his clothes, and put them in a trash bag. The gun was put in a hole in the wall of Joseph's apartment. Joseph confirmed Jennifer Pettie's recollection of what Russell said:

> "He told me that he was waiting in the bushes for Rob's signal and when he got the signal, he went out, made it look like a robbery, grabbed the necklace off her neck, took her pocketbook, put the barrel of the gun up to her chest, shot her. And he—she turned around and went down on one knee and he shot her in the back, and then he walked away and he said for some reason he don't know why, he turned back around and, uhm, just kept shooting her and he said he went blank; and with the last bullet, he turned and shot Rob in the leg and took off running."

Russell added that he shot Harris in the leg to make it look like Harris had nothing to do with the murder.

Joseph said that, at some point on the 28th, prior to his being brought in for questioning, he saw the police at Jantz's house and alerted Russell. Russell asked Joseph to bury the gun stored in the wall in Joseph's apartment. Joseph agreed and took the gun, along with the mask and gloves worn by Russell on the night of the murder, and buried them in the woods near Loudon Cemetery. During his interrogation later that day, he told the police what he had done and took them to the place where he had buried the items.

We have already recounted, in general, the story Russell Brill gave in court as to what had occurred. In contrast to that story, he admitted in his testimony that he had told

Joseph and the police that he, rather than Harris, had shot Ms. McLeod. He said that he told that to his brother because his brother always looked up to him as a thug and he did not want Joseph to think that he was a "punk" and "backed out of anything." He told that story to the police because he "didn't want to be no snitch." He also, as we shall describe, pled guilty to having shot and killed Ms. McLeod.

Based on the taped statements taken from Jantz, Pettie, and the Brill brothers, Russell Brill and Harris were arrested and charged with murder. On January 29—the next day—Lisa Petty, Russell Brill's girlfriend, had a telephone conversation with Russell, who was then in jail. He informed her that he had been arrested for murder, and, when she inquired whether he did it, he first replied that he had, but then recanted and told Ms. Petty that he had been hired to kill Ms. McLeod but was unable to do it, that Harris had shot her, and that he then shot Harris in the leg. Russell told Ms. Petty that he admitted being the shooter because he was afraid of Harris. Ms. Petty said that she would call Detective Massey and ask him to speak again with Russell. She did call Massey, and, from that conversation, Massey said that he learned that Harris was the shooter.

The indictments are not in the record now before us, but it is clear that both men were charged with first-degree murder and that the State filed a notice that it was seeking a sentence of life imprisonment without the possibility of parole as to each of them.

### The Deals With Brill and Bartee

During April and May, 1996, Brill was housed temporarily at the Maryland Penitentiary, apparently because of an overload at the Baltimore City Detention Center. While there, he met Donnell Bartee, who was awaiting trial on charges of first-degree murder, use of a handgun in a crime of violence, and possession with intent to distribute cocaine as well as a violation of probation charge that could and likely would result in execution of a suspended 15–year sentence. Brill had told him that he (Brill) was "locked up for shooting somebody

doing a favor, that a guy asked him to do a favor for some insurance money and he would pay him a lump sum of money," but that "he didn't do it. He was too scared."

In June, 1996, Bartee was moved to the Detention Center, where he met Harris. Harris asked whether, while at the Penitentiary, Bartee had met Brill, and Bartee said that he had. According to Bartee, Harris then offered to pay him $1,000 if he would tell Harris's lawyer that Brill had acknowledged robbing Harris, taking his gun, and shooting his wife. Bartee said he would think about it but instead related the conversation to his lawyer. Some time later, Harris approached him again and said that Harris's father would pay an additional $500, that Bartee would get half the money then from the father and the other half after he testified for Harris. Bartee related that as well to his lawyer. That revelation led to Bartee later telling his story to the police.

Bartee and Brill each entered into a plea agreement with the State premised, in whole or in part, on his testifying for the State in Harris's case. All three cases were pending in the Circuit Court for Baltimore City, and the agreements were made with the same prosecutor, who was handling all three cases.

Bartee's agreement came first. On January 17, 1997, the prosecutor and Bartee's attorney appeared before Judge Byrnes. Until Bartee entered the courtroom some time later, the entire proceeding, at the prosecutor's request, occurred at the bench. After some discussion, counsel agreed that Bartee would enter a plea of guilty to second-degree murder and possession with intent to distribute cocaine and the State would drop the handgun charge. The deal presented to the court was that Bartee would receive a maximum prison term of 30 years with respect to the two charges to which he would plead guilty and to any sentence executed as a result of the violation of probation proceeding; *i.e.*, Bartee would receive a 30–year sentence for the murder and a 10–year concurrent sentence for the drug offense, and, if Bartee received a prison sentence in the probation case and that sentence was to be consecutive to the 30–year term imposed in the instant case,

Judge Byrnes would then grant a motion to modify and make his 30-year sentence concurrent with that term, to assure a total "cap" of 30 years.

The prosecutor then disclosed an additional element to the agreement, namely, that Bartee was to testify in Harris's case, that, after his testimony, he could ask for a modification of his sentence—something less than thirty years—and that "the State may join into that modification upon his testimony." Defense counsel added that "the cap is also because the State indicated, if this man is so wonderful and so stellar on the stand that he can convince the State that they ought to really love him and want to kiss him, then they might join." The prosecutor responded that Bartee was going to testify regarding his conversation with a defendant in another case (Harris) but "was going to do a little bit more for the State and for himself" and, if that happened, Bartee would put himself in "much danger," and that "I was going to be willing to argue and actually, I would have argued and asked you to give less than that." The prosecutor noted, however, that "that can't happen at this point" and could not happen until Bartee testified, but "I did tell [defense counsel] that if he is supreme, I might join in with her and ask that you give to him less than the 30 which you've already given him."

Bartee then entered the courtroom, the conversation at the bench ended, and the prosecutor recited the agreement—a cap of 30 years for both the instant case and the probation case—and "one other proviso, I would add that we discussed at the bench about Mr. Bartee, that the Court knows about that, I'd rather not do that in open court." Addressing Bartee, defense counsel confirmed the basic understanding, adding that "the other circumstances that are here, if they haven't been stated, were stated at the bench as to any conditions that may or may not get the State's Attorney to want to join us in asking for less time." After assuring that Bartee's plea was knowing and voluntary, Judge Byrnes accepted it and, pursuant to the plea bargain, sentenced Bartee to 30 years for the murder and 10 years, concurrent, for the drug violation. A month later, in February, 1997, Judge Johnson, presiding over the violation of

probation case, revoked Bartee's probation and directed execution of the 15–year suspended sentence, to be served consecutively to the 30 years imposed by Judge Byrnes. At that point, Bartee began serving a 45–year sentence.

Harris's trial began on March 20, 1997. Bartee testified as indicated above, recounting first his conversation with Brill while at the Penitentiary, in which Brill said that he had not killed Ms. McLeod, and his subsequent conversations with Harris at the Baltimore City Detention Center, in which Harris offered him money to testify that Brill had admitted robbing Harris and McLeod and shooting Ms. McLeod. On further questioning by the prosecutor, Bartee said that he had pled guilty to second-degree murder and "possession with distribution," that he received a sentence of 30 years and was then serving a sentence of 45 years.

The prosecutor then asked a number of questions regarding his guilty plea. When asked whether he had "any understanding with the State as to your testimony here today," Bartee replied "none." In response to the next question, of whether he had entered into any agreement with the State "in reference to your testimony and your charges," he replied "no, not that I know," and when asked whether he was "getting anything for pleading guilty," he said "no." He acknowledged that he had the ability to file a motion for reconsideration of his sentence but that he had no guarantee that the entire sentence he would have to serve would be only 30 years.

On cross-examination, Bartee acknowledged that the deal he made was that his combined sentence, from the pending charges and the probation proceeding would not exceed 30 years, but he said that he was currently serving a sentence of 45 years—that he had received, as expected, a 15–year sentence for the violation of probation, consecutive to the 30–year sentence imposed by Judge Byrnes. At no time did the prosecutor, in direct or redirect examination, mention the likelihood of not opposing, or even joining, a motion to modify Bartee's sentence.

In July, 1997, following Harris's conviction, Judge Byrnes considered Bartee's motion to modify the 30–year sentence.

The prosecutor acknowledged that the plea bargain contained two elements: (1) that Judge Byrnes's sentence would be structured so that the maximum time Bartee would have to serve under that sentence and any received from Judge Johnson would be 30 years, and (2) that Bartee could ask for less and, if he testified properly in Harris's case, the State might join in that request. In that latter regard, he advised that "it was the State's understanding of the agreement that we would not oppose the defendant asking the Court to modify his sentence after the defendant testified and the State would tell the Court how the defendant did." Bartee asked for a further reduction in his sentence, beyond implementing the 30–year cap, and the prosecutor advised that he had no objection to such a reduction and that the detectives in the case supported it. Judge Byrnes then restructured and modified his sentences in such a way as to reduce the overall prison term to a maximum of 25 years.[5]

On March 12, 1997, about a week before the start of Harris's trial, Russell Brill appeared before Judge McCurdy and entered into a plea agreement. In return for a plea of guilty to first-degree murder, use of a handgun in a crime of violence, and conspiracy to commit first-degree murder, the State withdrew its notice of intent to seek life imprisonment without parole, and Brill was sentenced on the murder and conspiracy charges to life imprisonment with all but 50 years suspended and 20 years on the handgun charge, all sentences to be served concurrently.

We have recounted Brill's testimony at Harris's trial, including the fact that he had pled guilty to killing Ms. McLeod,

---

5. At the prosecutor's request and with Bartee's concurrence, Judge Byrnes completely restructured both the convictions and the sentences. As noted, in January, 1997, Bartee was sentenced to 30 years for murder and 20 years, concurrent, for the drug offense. The handgun charge was nol prossed. In July, the court reduced the sentence for murder to 10 years, struck the drug conviction and sentence entirely, resuscitated the nol prossed handgun charge, and entered a conviction and concurrent sentence of 10 years on that charge. As Judge Johnson's 15–year sentence was consecutive to Judge Byrnes's 10–year sentences, that effected a 25–year combined sentence.

which was inconsistent with his assertion that Harris had shot her. On direct examination, he said that the State had initially filed a notice of intent to seek life without parole but that he had, in fact, been sentenced to life imprisonment, with all but 50 years suspended. When asked whether he had entered into any agreement with the State for his testimony, his answer was "no." On cross-examination, he said that he had pled guilty to first degree murder not because he committed the crime but because he did not want to go to jail for the rest of his life but then indicated that he did not consider 50 years "a deal." He acknowledged that his sentence could be modified on a motion filed within 90 days, but, when asked whether he could get a lesser sentence "depending on your testimony here today in court," he responded "I don't know if it depends upon this but I know I can get a modification of sentencing."

At some point within the allowable 90–day period Brill filed a motion for modification of sentence, and, on November 10, 1997, he appeared before Judge McCurdy on that motion. At that hearing, the prosecutor informed the court that "part of the agreement" was that Brill would testify in Harris's case and that "we told the Court that we would not be opposing the Defense filing a Motion to reconsider and holding that sub curia to see how, in fact, Mr. Brill testified at the trial." The prosecutor added that Brill did testify for the State "and did a very good job" and that he was "not opposed to the Court doing any type of modification to Mr. Brill's sentence." At Brill's request, the court modified the sentence by reducing the time to be served to 30, rather than 50, years.

The post conviction trial court, as noted, found no violation of *Brady*. It concluded that there was no evidence that Brill's plea agreement had been withheld from defense counsel or that Brill was not truthful in describing it. Although noting that Bartee may not have "accurately and completely" disclosed his plea agreement, defense counsel "had in fact been advised of the nature and the full extent of Bartee's plea agreement" and that he read "the full extent of the plead agreement" into the record.

The Court of Special Appeals disagreed and concluded that, under this Court's decisions in *Ware v. State,* 348 Md. 19, 702 A.2d 699 (1997) and *Wilson v. State,* 363 Md. 333, 768 A.2d 675 (2001), the State "should have disclosed to appellant's trial counsel what position the prosecutor had agreed to take at the hearings on the motions for modification filed by Brill and Bartee, provided that the prosecutor was satisfied with the witness's testimony." The appellate court agreed, however, that the jury was aware that Bartee "could anticipate a modification pursuant to the plea agreement" and declined to "hypothesize a jury that would have made a different credibility assessment of [Brill] if it also knew that the State's agreement with Brill also included a promise that—at Brill's motion for modification of sentence hearing—the State would (1) not oppose modification, and (2) advise the sentencing judge that Brill had testified truthfully when called upon to do so during appellant's trial."

## DISCUSSION

In *Brady v. Maryland, supra,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215, the Supreme Court, building on earlier decisions, held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Since that 1963 decision, the Supreme Court has refined and extended that ruling in several respects, including holdings that the State's Constitutional duty to disclose encompasses evidence usable to impeach a State's witness by showing bias or self-interest and that disclosure of *Brady* material must be made even without a defense request for it. *See Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *Kyles v. Whitley,* 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995); *Youngblood v. West Virginia,* 547 U.S. 867, 126 S.Ct. 2188, 165 L.Ed.2d 269 (2006).

■ We, too, have expounded on the Constitutional analysis proceeding from those decisions. As we pointed out in *Grandison v. State*, 390 Md. 412, 431, 889 A.2d 366, (2006), citing *Conyers v. State*, 367 Md. 571, 597–98, 790 A.2d 15, 30–31 (2002), in order to establish a *Brady* violation, the petitioner must show that (1) the prosecutor suppressed or withheld evidence that would have been favorable to the defense because it (i) was exculpatory, (ii) provided a basis for mitigation of sentence, or (iii) provided a basis for impeaching a State witness, and (2) the suppressed evidence was material. The issues now before us touch on both prongs of that test: did the prosecutor withhold evidence that provided a basis for impeaching Bartee and Brill, and, if so, was that suppressed evidence material?

In *Ware v. State, supra,* 348 Md. 19, 41, 702 A.2d 699, 710, we confirmed, without equivocation, that "[e]vidence that the State has entered into an agreement with a witness, whether formally or informally, is often powerful impeachment evidence and the existence of such a 'deal' must be disclosed to the accused." The importance of that kind of evidence, we said, was underscored by the Supreme Court's observation in *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217, 1221 (1959) that "[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." *See also Marshall v. State*, 346 Md. 186, 197, 695 A.2d 184, 189–90 (1997) ("Where a witness has a 'deal' with the State, the jury is entitled to know the terms of the agreement and to assess whether the 'deal' would reasonably tend to indicate that his testimony has been influenced by bias or motive to testify falsely.") [6]

---

6. *Marshall* was not a *Brady* case, but rather involved a limitation on cross-examination. The point made, however, is equally applicable in a *Brady* analysis.

 The standard for measuring the materiality of undisclosed evidence depends on whether the facts demonstrate that the prosecution's case included perjured testimony and that the prosecution knew or should have known of the perjury. If so, the conviction must be set aside "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342, 349–50 (1976); *Grandison v. State, supra,* 390 Md. at 431, 889 A.2d at 377. When there is no false testimony, the standard of materiality is "whether there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." In that regard, a "reasonable probability" is "a probability sufficient to undermine the confidence in the outcome." *Grandison, supra,* 390 Md. at 432, 889 A.2d at 377, quoting from *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674, 698 (1984). *See also United States v. Bagley, supra,* 473 U.S. at 681–82, 105 S.Ct. at 3383, 87 L.Ed.2d at 494 and *Kyles v. Whitley, supra,* 514 U.S. at 434–35, 115 S.Ct. at 1565–66, 131 L.Ed.2d at 506.

 With respect to the first prong of a *Brady* analysis, it is clear that defense counsel knew, and the jury was informed, that both Brill and Bartee had entered into a plea agreement with the State, that they had received some degree of leniency as part of the agreement, and that each was entitled to seek further leniency through a motion to modify his sentence. What clearly and deliberately was *not* disclosed, however, and what the jury was therefore not told, was that, depending on their testimony, the State would not oppose and might even support further leniency.

When Bartee and Brill entered their respective pleas, the prosecutor seemed to indicate only that the State "might" join in or not oppose a subsequent request for leniency. In the actual modification proceedings, however, he was more candid about the nature of the agreements. As we have observed, in the modification proceeding before Judge Byrnes with respect

to Bartee, the prosecutor acknowledged that *"it was the State's understanding of the agreement that we would not oppose the defendant asking the Court to modify his sentence after the defendant testified and the State would tell the Court how the defendant did."* (Emphasis added). Similarly, in Brill's modification proceeding before Judge McCurdy, the prosecutor recounted that, when the plea agreement was presented to the court, "we also, at that time, stated to the Court—and I'm not sure if the Court remembers—*but we told the Court that we would not be opposing the Defense filing a Motion to reconsider and holding that sub curia to see how, in fact, Mr. Brill testified at trial."* (Emphasis added). Those commitments on the part of the State bore fruit. Bartee received a five-year reduction off a 30–year sentence, and Brill received a 20–year reduction off a 50–year sentence.

There can be little doubt, under current jurisprudence, that the State's commitment not to oppose a further reduction in Bartee's and Brill's sentences, depending entirely on its satisfaction with their testimony in Harris's case, constituted relevant impeachment evidence favorable to the defense that was required to be disclosed. The command of *Brady* and its progeny was unquestionably, knowingly, and inexcusably violated. The issue is whether the non-disclosure was material: was there a reasonable probability—a probability sufficient to undermine confidence in the outcome of the case—that, had this information been disclosed and presented to the jury, the result of the proceeding would have been different?

In *Wilson v. State, supra,* 363 Md. 333, 352, 768 A.2d 675, 685, we listed a number of factors to be considered in assessing the materiality of non-disclosed evidence for purposes of *Brady,* among which are: the closeness of the case against the defendant and the cumulative weight of the other independent evidence of guilt; the centrality of the particular witness to the State's case; the significance of the inducement to testify; whether and to what extent the witness's credibility was already in question; and the prosecutor's emphasis on the witness's credibility in closing argument. *See also Conyers v.*

*State, supra,* 367 Md. 571, at 612, n. 36, 790 A.2d 15, at 40, n. 36. Some of those considerations may point in one direction, some in another. The ultimate determination of materiality must arise from a composite, an amalgam, of them.

■ The central, predominating fact here is that the State's case against Harris depended largely on the jury's assessment of his credibility as opposed to that of Russell Brill. Directly or indirectly, Brill provided most of the incriminating evidence against Harris. Brill was the one who presented the direct personal-knowledge evidence of the conspiracy, the solicitation, and of Harris's criminal conduct at the scene. There was no other direct evidence of what actually occurred at the scene of the crime—of who shot Ms. McLeod. The corroboration of Brill's version of the solicitation and conspiracy—from Jantz, from Joseph Brill, from Jennifer Pettie, and from Lisa Petty—was derived in large part from what Russell Brill had told them.

In contrast, Harris had no criminal record, and the State produced no evidence of any apparent motive he had to kill his fiancé. There was some testimony about insurance policies on Teresa's life, but her mother testified that she was the sole beneficiary on those policies and that she, in fact, collected the proceeds. Although the result was not conclusive, the gunshot residue test performed while Harris was at the hospital was negative. In short, there is at least a reasonable probability that Harris would not have been convicted had the jury not believed Brill's testimony and the repetition by others of what Brill had told them.

On the other hand, the jury was aware that Brill was by no means a saint. He described himself as a thug and a gangster and seemed to be proud of that status. He abused and trafficked in drugs. He not only had agreed to kill Ms. McLeod for $20,000, but told the police and his brother that he had actually done so, and, with his brother's connivance, he attempted to hide the gun and the clothes he wore on the night of the murder. At least of equal significance, he pled guilty to having committed the crime. His explanation for the

plea was that it allowed him to avoid the prospect of a life sentence without the possibility of parole, a prospect that, given the statements by Jantz, his brother, and Ms. Pettie as to what he had told them, was not insubstantial. Notwithstanding what it knew of Brill's background, however, including the fact that the 50–year sentence imposed on him a week earlier could theoretically be reduced, the jury obviously credited his version of the event.

Bartee's testimony bore directly on the credibility of Harris and Brill. He not only recounted Brill's statement to him as to what had occurred but, more importantly, testified that Harris had suborned perjury—that he had offered Bartee a substantial sum to testify falsely that Brill had admitted robbing and shooting Ms. McLeod. As with the case of Brill, the jury was aware that Bartee's credibility was less than stellar—that he had an extensive and serious criminal record—and that Harris had denied ever offering money for false testimony.

It is in this "he said/he said" setting that we need to evaluate the probable impact of the jury's knowing that the State had agreed not to oppose, and possibly even to support, reduced sentences for Bartee and Brill. Both of those men had been convicted of murder and, even after having already received leniency by reason of their plea agreements—a reduction from 45 to 30 years for Bartee and reduction of a possible sentence of life without parole to 50 years for Brill— they would still be serving very long sentences, with early parole not likely. In both cases, the jury would have little reason to believe that, having already agreed to substantial leniency, the court would be inclined to act favorably on their motions for a further reduction in their sentences, especially as both men denied any expectation that their testimony would have any impact in that regard.

We cannot help but conclude that such a doubt would have been significantly eroded and that there is a reasonable probability that the jury would have assessed the credibility of Brill and Bartee, and thus of Harris, differently if made aware that,

upon being sufficiently pleased with their testimony, the State had agreed not to oppose a further reduction in the sentences of those two men. Common sense alone would suggest that the court would be much more inclined to grant a further reduction if the State did not oppose the request and acquiesced in it. The jurors were instructed that they were the sole judges of whether a witness should be believed and that they were to use their "own good common sense and every day experiences" in making that judgment, including whether the witness had a motive to tell the truth or not and whether the witness had "an interest in the outcome of the case."

Without knowledge of the State's commitment not to oppose a further reduction in Bartee's and Brill's sentences, the jury had no reason to believe that those men had any interest in the outcome of Harris's case, any reason to testify falsely— their deals had already been made, and they had already been sentenced. Knowledge that a further reduction in their sentences was much more likely if the State was satisfied with their testimony would almost certainly have placed their credibility—their motive to testify as the State wished—in a different and less favorable light, sufficiently so, in our judgment, to have probably raised a reasonable doubt as to Harris's guilt. Harris is entitled to a new trial, and that unfortunate result must be laid entirely in the lap of the prosecutor for failing to comply with a Constitutional mandate that has been well known for decades, especially to prosecutors.

JUDGMENT OF COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE ORDER OF THE CIRCUIT COURT FOR BALTIMORE CITY DENYING PETITION FOR POST CONVICTION RELIEF AND TO REMAND CASE TO THE CIRCUIT COURT WITH INSTRUCTIONS TO GRANT THE PETITION AND AWARD PETITIONER A NEW TRIAL; COSTS IN THIS COURT AND IN COURT OF SPECIAL APPEALS TO BE PAID BY MAYOR AND CITY COUNCIL OF BALTIMORE.