(109 N. W. 66.)

----

E. P. Gates v. Fred A. Kelley.

Opinion filed August 3, 1906. Rehearing denied February 13, 1907.

**Trusts — Constructive Trusts — Evidence.**

1. Evidence examined, and *held* to show that a deed from C. to K. was executed with the intent on C.'s part to cure a defective foreclosure and to perfect the title in the person claiming under the mortgage sale, and that K. induced the execution of the deed to himself by representing himself to be the agent or attorney for the person claiming title under the defective foreclosure.

**Same.**

> 2. The grantee in a deed so obtained is a trustee of the legal title for the benefit of the person in whose favor the grantor intended the deed to operate.

Appeal from District Court, Nelson county; *Fisk, J.*

Action by E. P. Gates against Fred A. Kelley. Judgment for defendant, and plaintiff appeals.

Reversed and judgment entered.

*Frich & Kelly,* for appellant. *Scott Rex* and *George A. Bangs,* for respondent.

ENGERUD, J. This is a suit in equity whereby the plaintiff seeks to have the defendant declared to be a trustee ex maleficio of the title of a quarter section of land in Nelson county, and to compel the defendant to convey the legal or record title to plaintiff, who claims to be equitably entitled thereto. The answer is a general denial. The issues were tried without a jury and resulted in a judgment for defendant, from which judgment the plaintiff appeals, demanding a retrial of all the issues.

On July 5, 1884, Chester Cranmer was the owner in fee of the southwest quarter of section 15, township 153, range 59, in Nelson county. On that day he borrowed from Anna Hoagland $450, secured by a first mortgage on said land. The debt was evidenced by a promissory note due November 1, 1889, with coupons attached representing the interest to be paid for the loan. By a mistake of the scrivener the mortgage described the land as being in range 58. This loan was procured through the plaintiff, E. P. Gates, who was then a banker and real estate loan broker in Grand Forks. A second mortgage was at the same time given by Cranmer to Mr. Gates to secure the latter's commissions on the loan. The commissions aggregated $96, payable in annual installments, being the equivalent of 4 per cent annual interest. The loan was evidently made at the rate of 12 per cent per annum; the broker reserving one-third of the annual interest as his commission. This second mortgage described the land correctly, and it is expressly stipulated therein that it is subject to the mortgage to Anna Hoagland. Both mortgages contained the usual power of sale in case of default. Cranmer abandoned the land in 1885, and has never since paid any taxes thereon or any of the interest or principal

of the mortgages. On July 30, 1886, the Hoagland mortgage was foreclosed by advertisement and the premises sold to Anna Hoagland for the amount of the mortgage. There was no redemption, and a sheriff's deed in due form was issued to the purchaser on August 1, 1887, and duly recorded. This deed, as well as the certificate of sale, which was also recorded, gave the correct description of the premises, but the same misdescription appeared in the notice of sale as that found in the mortgage. It is conceded that the foreclosure is wholly void. Anna Hoagland subsequently executed and delivered a deed of the land to Peter V. Hoagland, and the latter on January 4, 1900, executed a deed thereof to plaintiff, both of which deeds were recorded. There has been no possession taken of the land under any of these deeds, but the premises have been unoccupied until the defendant took possession in 1902, as will hereafter appear. In 1901 Mr. Gates discovered that the title supposed to have been acquired through the foreclosure was invalid by reason of the misdescription of the property. He decided to endeavor to acquire title by a foreclosure of his second mortgage. He was referred to the defendant, who was and is an attorney at law engaged in the practice of his profession at Lakota, in this state. The plaintiff was then a resident of Minneapolis, Minn.

On January 14, 1902, plaintiff wrote to defendant, inclosing his second mortgage against Cranmer, and also another mortgage upon another tract of land. He requested Mr. Kelley to proceed to foreclose both mortgages at once on the terms proposed in the letter, if they were acceptable. A check for $50 was inclosed to apply on the fees. He also requested Mr. Kelley to notify him by telegraph if he would do the work, as he (Gates) intended to start on a journey to California on the morning of January 16th. This letter in the usual course of mail reached Lakota on Wednesday, January 15th, the day after it was mailed, but the defendant asserts that, owing to his absence from Lakota, he did not actually receive it until the afternoon of Thursday, the 16th, too late to comply with Mr. Gates' request for a telegraphic reply. In answer to Mr. Gates' letter the defendant wrote the following letter:

Lakota, Jany. 17th, 1902.

"E. P. Gates, Esq., Los Angeles, Cal.—Dear Sir: Your favor of recent date, enclosing mortgages Cranmer to Gates and Flatin to

Gates, at hand, together with draft for $50.00 arrived during my absence, and was therefore unable to wire you as requested. I am sorry to say that I cannot represent you in the Cranmer case, as I am interested adversely, and I return herewith the papers in that case, together with chk for $25.00. I am willing to foreclose the other one, however, upon the terms named. If, however, you do not wish to separate the foreclosure, wire me upon receipt of this letter at my expenses, and I will return the papers in that case. together with the balance of the money. I regret that my absence has delayed this matter.

Very truly yours,                        Fred A. Kelly.

"Under a recent statute in this state no mortgages over ten years past due can be foreclosed by advertisement so that the Cranmer mortgage will have to be foreclosed by action and may be subject to the defense of the statute of limitations."

It is admited that this letter, although dated Jauary 17, 1902, was not mailed until January 18th. We shall have occasion to refer to this circumstance later. Immediately after the receipt of the Gates letter, and before the answer thereto was mailed, the defendant went by train to Willow City, in this state, near which place the mortgagor, Cranmer, lived, and obtained from him a quitclaim deed of the land in question, naming said defendant as grantee and reciting a consideration of $500. It is admitted that the actual sum paid by defendant for this deed was $75. The deed is dated and acknowledged January 18, 1902. Defendant returned to Lakota imediately after obtaining the deed and mailed the above letter to Gates, and on January 20, 1902, recorded the deed from Cranmer to himself. The following spring he took possession of the farm and has held possession since, claiming title under said deed. We will add that Gates, after receiving the answer to his letter transmitting the Cranmer papers, declined Mr. Kelley's services in the foreclosure of the other mortgage, and the papers relating thereto and the remaining $25 were returned to him by defendant. Such, in brief, are the undisputed facts out of which this controversy arises.

Plaintiff alleges and claims that the evidence proves (1) that the relation of attorney and client existed between defendant and plaintiff when the deed was obtained by Kelley, and that the transaction was a betrayal by the latter of his trust; (2) that Kelley secured the deed to himself by inducing Cranmer to believe that

it was to operate as a conveyance to plaintiff so as to cure the latter's defective title. We are convinced that the second proposition just stated is true, and that it is decisive of the case, without considering the first one. Throughout this opinion, therefore, we shall assume in favor of the defendant that the relation of attorney and client had never existed between himself and the plaintiff.

There were no witnesses present at the interview between Cranmer and Kelly at Willow City, which resulted in the execution of the deed. The decision of the case hinges altogether upon what was really said and done at this interview, and upon the circumstances which brought it about. Cranmer and Kelly, who alone know the facts, give wholly different versions of the transaction, and their testimony cannot be reconciled or the variance accounted for on the theory that one of them was mistaken. It is a question of veracity between these two men. At the time Cranmer occupied the premises in dispute Kelly was occupying a nearby farm, which he still owns, and they were then well acquainted and on friendly terms. Cranmer is single, and since leaving said farm has lived in McHenry and Bottineau counties, except about two years that he was in Montana. At one time he owned a quarter section of land in McHenry county which he sold and deeded in 1886 to one Crane, but the deed contained a defective description. In August, 1900, Kelly met Cranmer by appointment at Rugby and procured from him a quitclaim deed to Crane to correct the defect in the old deed, paying him therefor $25. We mention these facts because they play an important part in the consideration of what actually transpired at the subsequent transaction now in question.

Cranmer's testimony was taken by deposition. He testified that Kelley came to Willow City in January, 1902, where the witness met him at the depot as he was getting off the train; that he had no recollection of any previous appointment to meet Kelley, but was hauling wood to town at that time, and happened to be in town with a load when Kelley arrived. What then transpired is narrated by the witness as follows: "He [Kelley] said that, when he came to me, he was like a little fairy—he always brought good tidings —that there was an error in my name, and the man that owned the land had employed him to straighten it up, and he would give me $50 to sign a quitclaim deed. It would cost that to put it through the courts. He didn't need none of my help; that he [his

client] was wealthy and could put it through the courts; but that the man who owned the land would give me $50 instead of putting it through the courts if I would take it. I hesitated about taking it, and he told me he would give me $75, and if the man he was doing business for wouldn't stand it I would have to give him back $25, and I agreed to it and signed the quitclaim deed." The witness could not recall whether the grantee's name was mentioned or not, but he was given to understand that the deed was to run to the man who had loaned the money and that Kelley represented him. He says Mr. Kelley produced the deed written out ready for signature, and witness signed it in the room of the hotel where the transaction took place. They then went before the notary, who executed the certificate of acknowledgment, and then to the bank, where Mr. Kelley drew a check for $75, which the banker cashed and the same was paid to the witness. He and Kelley then parted; the transaction having occupied only 30 or 40 minutes. He did not know when Kelley left town. He denies positively that he had ever had any previous talk or understanding with Kelley about the title to this land, or that he had ever requested him to look up the title. He knew the land had increased in value since he left it, and supposed the mortgagee had obtained title thereto. He asserts that this deed, like the one Kelley procured for Crane, was asked for and given solely to remedy the defective title, caused by an error in his name, and for no other purpose; and he did not notice who was named therein as grantee. The testimony of this witness bears every indication of candor and truthfulness.

Mr. Kelley testified at the trial, and his version of the transaction is as follows: At the time of the Crane transaction at Rugby in August, 1900, Cranmer inquired of Kelley what had become of the Nelson county land and requested Kelley to look it up, suggesting that there might be some chance of getting something out of it. Kelley agreed to do so, but neglected it for some time. He finally examined the records and discovered that by reason of the misdescription in the mortgage Cranmer's title had not been divested by the foreclosure. There was also a tax deed to plaintiff which witness says he found to be wholly void. Just when this examination of the record was made does not appear. He says he did not at once communicate the results of his examination to Cranmer, because Cranmer was of a roving disposition, and it was uncertain where he could be found; that Cranmer was an ignorant

man, and the situation could not be explained to him in a letter so he would understand it. For these reasons he let the matter rest for some time, intending to hunt him up and have a personal interview with him some time when he might be in the vicinity where Cranmer usually stayed. The letter from Mr. Gates called the matter to his attention, and on the next day, January 17th, he went directly to Willow City in search of Cranmer for the purpose of coming to an understanding with him, arriving at Willow City between 3 and 4 o'clock p. m. of that day. He asserts that he wrote the answer to Mr. Gates letter before he left Lakota on January 17th, but did not mail it until his return the next day. He says he was not certain of Cranmer's whereabout; but in explanation of his trip direct to Willow City without making inquiry he says: "I thought if I couldn't find Cranmer out there —as I say, he was a nomadic sort of chap—I was coming back next day. I didn't see that Mr. Gates' interests could be prejudiced in any way, and if I couldn't find Mr. Cranmer out there, I wasn't going to hang around there to find him. I would feel that I had done my duty so far as he was concerned, and I would come back and foreclose the mortgage for Mr. Gates." In the face of this explanation we are unable to account for the writing of the letter to Gates before Kelley's departure, and especially the statement therein that he could not foreclose the Cranmer mortgage because the writer was interested adversely. We think the letter must have been written and mailed after Kelly's return from Willow City, and for some reason dated back.

But to return to defendant's testimony. On his arrival at Willow City he was informed that Cranmer lived a few miles from town, and he hired a team and driver from a livery barn and directed the driver to find Mr. Cranmer and bring him to town. Next morning, January 18th, Kelley found Cranmer at the hotel and obtained the deed under the following circumstances: He explained fully and in detail the condition in which he found the title; that the foreclosure was void; that the tax deed was not "worth the paper it was written on;" that the mortgages were outlawed, and the land worth from $2,500 to $3,000. He urged Cranmer to institute proceedings to recover the land; and, when the latter said he had no money to litigate with, Kelley stated that it would not require much money, and offered "to take it up with him and speculate," as the land was valuable and he thought the title was good. Cran-

mer, however, was disinclined to litigate, and requested Kelley to make an offer for the land. The latter first offered $50 and finally raised the offer to $75, and Cranmer promptly accepted it. Kelley then went out for a blank deed, filled it out in the hotel, and Cranmer then and there signed it. After it had been acknowledged they went to the bank, where the check was cashed and paid to Cranmer. The check was drawn to Cranmer at the hotel while the transaction was in progress. It is a noticeable fact that the check bears date January 17, 1902, and we firmly believe that is the true date of the transaction, notwithstanding the deed is dated January 18th, and purports to have been acknowledged that day. If the two instruments had been written at the same time and place, it is not likely that they would bear different dates. It is very apparent on inspection that Cranmer's signature on the deed was written with a different ink than was used for the body of the instrument; while the ink used in writing the body of the deed appears to be the same as that used in Kelley's letter to Gates. It is evident that the deed had been prepared for signature, as Cranmer says, before the interview took place, and was dated ahead for some reason. The body of the certificate of acknowledgment seems to be in the same handwriting as the body of the deed, and it is easy to conceive how the notary may have attached his signature and seal without noticing or correcting the erroneous date. There could be no reason for dating the check back, and, as it was to be cashed at the bank at once, it could not well be dated ahead.

For the purpose of corroborating Kelley and discrediting Cranmer, one Lee Keller was produced as a witness. He was working in the livery stable at Willow City in January, 1902, and swears that he was the driver of the team which Kelley says he dispatched in search of Cranmer. He testifies that Kelley handed him a letter to Cranmer, and told him to drive until he found him and to bring him to Willow City. Keller swears that he did not find Cranmer at home, but finally found him after midnight some distance away; that he gave Cranmer Kelley's message and induced him to dress and accompany the witness to town, where they arrived about 3 o'clock in the morning of January 18th; that Cranmer went to bed in the hotel. In corroboration of this story, the book kept at the livery stable was produced, and he identified a certain entry therein, which he asserts refers to the trip made for Kelley. The book was one ruled and spaced especially for the

use of livery stables. The original leaf containing the entry is in the record. It shows a trip made by Lee Keller for a stranger at 4:15 p. m. on January 16, 1902, for which $3.50 was collected. The witness testified that the entries refer to trips made on the 16th and 17th, and that this particular trip was probably on the 17th. The entry in question is the fifth of eight entries; all appearing under the same date. The date is written out at the top of the column and ditto marks appear beneath it opposite each entry. The date at the top was originally "Thursday, January 16th," but there has been inserted with an entirely different ink in the same column with "16" and above it the figures "& 17." Below these eight entries are two entries showing the "Amount of drives for the day," and "Feed and collections," and two heavy lines are drawn across the page to separate these entries from the entries for the next day. The entries on the leaf in the record cover the priod from January 16th to 26th, inclusive, and in every instance the date of each entry is shown either by figures or ditto marks; and, where there are more than one entry in a single day, they are separated from the next entry in the manner above indicated The books seem to have been kept in a very orderly manner. It appears to us that the entry pointed out by Keller was originally made under date of January 16th, and the figures "& 17" were subsequently inserted in a clumsy attempt to give color to the claim that the entry referred to a drive on January 17th. The circumstance that no business was done on January 18th is not remarkable at such a season of the year, when storms and bad roads are common. The absence of any record of a drive on January 17th convinces us that Keller's midnight drive is a fiction. Hence, to our minds, the testimony of Lee Keller has the opposite effect to that intended. If Cranmer had been sent for and brought to town in the manner claimed by defendant, he could hardly fail to remember it, and it is inconceivable that he would willfully swear falsely as to that fact, as to which there could be no possible reason to falsify, even though he had some motive for falsifying as to the bargain with Kelley. But Cranmer had apparently no motive to tell anything but the truth as to the transaction. He had nothing to gain or lose from the result of this action. There was testimony showing that his reputation for truth and veracity was bad; but even an untruthful man will not usually lie without a motive. We cannot escape the conviction that the

interview took place on the 17th, and that the deed had been prepared at Lakota beforehand.   This being so, the conclusion follows that Kelley left Lakota after receiving Gates' letter with the fixed determination to get the deed from Cranmer, if he could, and when he succeeded he wrote the letter, dated January 17th, to the effect that he was interested adversely.   The reason for dating the letter back and dating the deed ahead thus becomes obvious.   It would aid to give color to his claim that he had been previously engaged by Cranmer and had promptly declined Gates' retainer for that reason, and that the deed to himself was an afterthought.   Had the facts been as Kelley claims, it is extremely improbable that he would make use of the expressions or give such meager information as appear in the letter to Gates, and it is still more improbable that he would have written the letter before he left Lakota in search of Cranmer.   Kelley's explanations of his neglect to write to Cranmer, or even make inquiries to locate him after he discovered the defective title, are very unsatisfactory, and it is remarkable, to say the least, that immediately upon receipt of Gates' letter Kelley, although professing such uncertainty as to Cranmer's whereabouts, proceeded without delay or inquiry to the very place where Cranmer was found.   It is still harder to believe that Cranmer for the paltry sum of $75 would deed to Kelley land worth $2,500, which the latter had assured him he could and would recover for the former on a contingent fee without the outlay of much money.

We shall not further prolong this analysis of the evidence.   Suffice it to say that Cranmer has apparently no motive to falsify, and his testimony is probable and consisitent and bears the impress of truth.   We regret to say that the contrary is true of the defendant's evidence.   We find that Kelley induced Cranmer to execute the deed by representing himself to be acting in behalf of the claimant under the mortgage, and that Cranmer made the conveyance with the intent that it should operate to remedy a defect in the title claimed under the foreclosure.   The grantee of a title so acquired will not be permitted to reap the fruits of his wrongdoing; but will be deemed in equity a trustee of the legal title for the benefit of the person in whose favor it was intended by the grantor that the deed should operate.   It is not essential to the application of this rule that the grantee should have violated any trust or confidence reposed in him by the person for whom the deed was in-

tended or that such third person should have any legal or equit-
able claim to the land against the grantor. As said by Judge Mit-
chell in Rollins v. Mitchell, 52 Minn. 41, 49, 53 N. W. 1020, 38
Am. St. Rep. 519: "The rights of the third person in such cases de-
pend, not upon the fact that he had some legal or equitable claim
to the property before the constructive trust was created, but
upon the fact that he acquired such right by the trust as being
the party for whose benefit it was intended by the owner." See,
also, 1 Perry on Trusts, section 181.

The plaintiff has tendered and still offers to pay the money
expended by defendant in obtaining the deed and also compensation
for his services in doing so. The defendant has not chosen to
show what his expenses were or the value of his services, and it
may be questionable if he is entitled to such compensation under
the circumstances of this case.

The judgment is reversed, and a judgment will be entered to
the effect that the legal title acquired through the deed in question
is held in trust by defendant for the use of plaintiff, and that the
latter is, and since the delivery of said deed has been, the owner of
the land in fee simple, and entitled to the possession, rents and
profits thereof, and entitled to a conveyance of the legal title from
the defendant, the judgment to have the effect of such conveyance.
As the costs taxable in plaintiff's favor will necessarily exceed the
sum of $75, the amount paid by Kelley for the deed, that sum
may be deducted from plaintiff's costs and disbursements to be
included in the judgment. All concur.