996 A.2d 869

Leon Steven CALLOWAY

v.

STATE of Maryland.

No. 106, Sept. Term, 2009.

Court of Appeals of Maryland.

June 10, 2010.

Deborah S. Richardson, Asst. Public Defender (Paul B. DeWolfe, Public Defender, of Baltimore, MD) on brief for petitioner.

Diane E. Keller, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, of Baltimore, MD) on brief for respondent.

BELL, C.J., HARRELL, GREENE, MURPHY, ADKINS, BARBERA and JOHN C. ELDRIDGE, (Retired, Specially Assigned), JJ.

MURPHY, J.

In the Circuit Court for Montgomery County, Leon Calloway, Petitioner, was convicted of second degree assault. The State's evidence was sufficient to establish that he committed that offense by inflicting life threatening injuries upon his son Gavin, who was born on September 16, 2005, and rushed to Shady Grove Hospital on September 28, 2005. The State's evidence, however, included the testimony of one Nicholas Watson, Petitioner's former cell-mate at the Montgomery County Correctional Facility.

On January 8, 2007, Watson placed a telephone call to the Montgomery County State's Attorney's Office, and offered to testify about several inculpatory statements that Petitioner had allegedly made to him. When he placed that phone call, Watson was (1) awaiting trial on charges of second degree assault and reckless endangerment, (2) facing a violation of probation charge as a result of a guilty plea that he had entered on January 4, 2007, and (3) unable to post a $10,000 cash bail that had been established as a condition of his pretrial release. Between January 8, 2007, and the date on which Watson testified in the case at bar, the State (1) requested that he be released on a "personal bond," (2) "nolle prossed" the assault and reckless endangerment charges, and (3) filed a motion *in limine*, in which it requested that the Circuit Court prohibit Petitioner's trial counsel from cross-examining Watson about whether he had volunteered to testify for the State in the hope that he would receive some benefit in the cases that were pending against him when he contacted the prosecutor's office.

The Circuit Court granted the State's motion *in limine*, and the Court of Special Appeals affirmed Petitioner's conviction

in an unreported opinion filed on June 30, 2009. *Leon Steven Calloway v. State,* No. 2808, September Term, 2007. Petitioner then filed a petition for *writ of certiorari* in which he presented this Court with a single question: "Did the lower courts err in limiting defense counsel's cross-examination of the State's key witness regarding his expectation of leniency from the State?" We granted that petition. *Calloway v. State,* 410 Md. 701, 980 A.2d 482 (2009). For the reasons that follow, our answer to this question is "yes." We shall therefore reverse the judgment of the Court of Special Appeals, and direct that the case be remanded for further proceedings not inconsistent with this opinion.

## Background

The opinion of the Court of Special Appeals includes the following factual summary:

> The detectives who interrogated [Petitioner] testified that [Petitioner] admitted he may have "dropped" the baby and that he "may have swaddled him too tightly."
>
> Nicholas Watson, [Petitioner's] cellmate at the Montgomery County Correctional Facility, testified that [Petitioner] admitted to him that he had harmed Gavin. Prior to trial, Watson, who was awaiting trial on assault and reckless endangerment charges at the time he was housed with [Petitioner], contacted the State's Attorney's Office and offered to testify against [Petitioner]. At trial, Watson testified at length about conversations he had with [Petitioner] in which [Petitioner] implicated himself. Watson's testimony portrayed [Petitioner] as a "horrible person," who not only acknowledged harming Gavin, but also showed no remorse for doing so. Watson further testified that [Petitioner] believed that [Gavin's mother] was cheating on him and that the baby was not his.
>
> \* \* \*
>
> The prosecutor's theory, argued to the jury, was that [Petitioner] inflicted Gavin's injuries and admitted to having done so, both to the detective and to Watson. [Petitioner's] counsel argued to the jury that he was never alone with

Gavin, that he never had an opportunity to inflict the injuries and that [Petitioner] only made the confession to the police because he wanted to "take the rap" for [Gavin's mother] in order to keep his family together.

[T]he jury convicted [Petitioner] of one count of second-degree assault. As a consequence of the jury's inability to reach a unanimous verdict on charges of first-degree child abuse, second-degree child abuse and first-degree assault, a mistrial was declared as to these counts.

*Leon Steven Calloway v. State,* No. 2808, September Term, 2007, slip opinion at pp. 3–5.

The State's motion *in limine* included the following assertions:

3. Mr. Watson had pending charges of Second Degree Assault and Reckless Endangerment which were entered nolle prosequi on April 23, 2007 due to insufficient evidence.

\* \* \*

5. The State did not make any deals with Mr. Watson with respect to the previously pending matter in return for his testimony at trial in this matter, nor has the State made any promise, reward to inducement with respect to that charge in order to secure his testimony.

6. To the contrary, in every conversation the State has had with Mr. Watson regarding his testimony, he has adamantly insisted that he did not want anything from the State in exchange for his truthful testimony; instead, he has always stated that he was willing to testify because it was the right thing to do for the child.

7. However, based on conversations with defense counsel and based on counsel's request for detailed information on the criminal history of the State's witness, the State believes that the defense nevertheless will seek to use information regarding the above-described criminal matter—a matter not involving an impeachable conviction—to impeach Mr. Watson at trial. The State be-

lieves this would be wholly improper and seeks a motion precluding any such cross-examination.

8. As the Court of Appeals has made clear, the fact that a witness has a pending criminal matter is not the relevant factor in deciding whether a witness has a possible bias that would be the proper subject of cross-examination. *Ebb v. State,* 341 Md. 578[, 671 A.2d 974] (1996). Rather, the "crux of the inquiry insofar as its relevance is concerned, is the witness's state of mind." *Id.* at 585[, 671 A.2d at 977]. In order words, it is irrelevant that a witness has or had a pending charge. The issue is whether the witness believes they will get some benefit from the government with respect to that charge in return for their testimony at trial.

* * *

10. When the witnesses in *Ebb* denied under examination by defense counsel that they expected anything in return for their testimony, the trial court ruled that the defendant "could not inquire in the jury's presence about pending charges." *Id.* at 585[, 671 A.2d at 977]. The Court of Appeals affirmed, holding that the trial judge "did not abuse his discretion in precluding the cross-examination of the witnesses about their pending charges." *Id.*

11. The *Ebb* case reaffirmed a principle articulated previously by the Court in *Watkins v. State,* 328 Md. 95, 100–103[, 613 A.2d 379, 381–383] (1992). In *Watkins,* the Court of Appeals, affirmed the trial court's decision to restrict cross-examination and to preclude defense counsel from inquiring about a witness's pending theft charge—a charge the witness was set to go on trial for after his testimony at trial—based on the prosecutor's representation that there was no deal with the witness regarding that charge. *Id.*

12. In the instant case, the State believes that Mr. Watson would testify that he had no deal with the State in connection with his previously pending charge. In

addition, the State anticipates that he would testify that he had no expectation of leniency from the State as to those matters based on his testimony at trial.

\* \* \*

14. Because the State's witness had no expectation of leniency and has had none in the past with regard to his previously pending matters, and because pending criminal matters are not otherwise a proper subject of impeachment pursuant to established precedent of the Court of Appeals, the defense should be precluded from making any inquiry about these matters in the jury's presence. *Ebb v. State,* 341 Md. 578, 585[, 671 A.2d 974, 978] (1996); *Watkins v. State,* 328 Md. 95, 100–103[, 613 A.2d 379, 381–383] (1992).

Petitioner's trial counsel argued that evidence of Mr. Watson's "previously pending matters" was admissible under *Leeks v. State,* 110 Md.App. 543, 678 A.2d 80 (1996), in which the Court of Special Appeals stated:

[A]n on the record evidentiary hearing, with the jurors out of the courtroom, is necessary when the trial judge is asked to rule *in limine* that a witness cannot be asked questions permitted by Rule 5–616(a)(4). Rules 5–401 and 5–403 apply at this hearing, interrogation should be limited to the matters listed in Rule 5–616(a)(4), and counsel are not entitled to turn the hearing into a discovery deposition. At this hearing, however, the trial judge must afford counsel an adequate opportunity to question the witness about every fact that would reasonably suggest the existence of bias.

\* \* \*

When the trier of fact is a jury, questions permitted by Rule 5–616(a)(4) should be prohibited only if (1) there is no factual foundation for such an inquiry in the presence of the jury, or (2) the probative value of such an inquiry is substantially outweighed by the danger of undue prejudice or confusion. If the trial court decides to exclude circum-

stantial evidence of bias, it must state why it is prohibiting counsel from presenting such evidence to the jury.

*Id.* at 557–58, 678 A.2d at 87 (footnotes omitted).

At the *in limine* hearing, Mr. Watson testified for the State. The record shows that the following transpired during his direct examination:

Q When you made that call to the State's Attorney's Office, were you expecting to get anything from the State, any kind of benefit?

A Not at all. Absolutely not. Nothing at all.

\* \* \*

Q And did you have pending charges at that time?

A Yes, I did.

\* \* \*

Q Prior to the detectives getting to MCCF, did you have an opportunity to speak with an attorney from the Public Defender's Office?

A Well, I spoke with my attorney from the Public Defender's Office who informed me at the time that they will be switching attorneys, because he was also representing Mr. Calloway.

\* \* \*

Q Okay. So, after speaking with the attorney from the Public Defender's Office, did you still wish to speak to the police?

A Yes.

\* \* \*

Q Okay. At that time in your mind, asking you what you were thinking, did you think that you were going to get some benefit from the State by talking to us about Mr. Calloway?

A No.

\* \* \*

Q Okay. Now, you were being held at MCCF with pending charges?

A Yes, ma'am.

Q Were you prosecuted for that case?

A The case was dropped.

* * *

Q Mr. Watson, at any point did you tell anyone in the State's Attorney's Office that unless the case against you was dropped you would not cooperate in the Calloway case?

A Absolutely not. In fact, it was just the opposite. I made it quite clear to everyone in the State's Attorney's Office that I wanted nothing in exchange for my testimony in the Calloway case. I made it quite, quite clear that I didn't want any help with my other case or anything in exchange for my testimony on the Calloway case, because I wanted no motive, wanted to show that the only motive I have was from the heart. That was the only motive I had.

* * *

Q At any point, Mr. Watson, did you expect any benefit to be given to you from the State in exchange for your cooperation?

A Never expect it, never want it, never asked.

The record shows that the following transpired during Mr. Watson's cross-examination:

Q Mr. Watson, on January 8th, you met with two detectives at the Montgomery County Correctional Facility after you talked to an Assistant State's Attorney, correct?

A Yes, ma'am. Yes, sir.

* * *

Q What details did you tell her?

A How Leon told me about the lie he told to the police about tripping over an extension cord, and all kind of things. It was numerous details that Leon went to the

case about, about fractures, old fractures on the baby, and how he thought the baby's mom was cheating on him, and how he continuously called the baby, [expletive] that little [expletive]. I mean numerous statements. And the way his attitude was towards the case and the baby, you know, his, his, his arrogance towards the case, his, his, you know, the way he talked about his baby as if it was some inanimate object, and the way he bragged about he was going to beat this case.

\* \* \*

Q Now, when you met with the police detectives on January 8, 2007, they tape recorded the interview with you, correct?

A Yeah. Yeah.

\* \* \*

Q And you told them, you said to them, "I'm going to be completely honest with you. My intentions are all good," right? Do you remember saying that to the detectives?

A Yea, my intentions were all good. I mean I had all good intentions.

\* \* \*

Q All right. And the reason you were talking about that is because the police detective, Detective Wilshire, said to you early on, "Usually when inmates call us and they say they want to talk to us and provide us some information, they want to do it in return for something else." That's what Detective Wilshire told you, correct?

\* \* \*

A I remember him saying that, but I also made it clear to him also when we sat down that I want you guys to know that I'm not doing this for any other reason. You know, I'm doing this, I'm doing this because I want to do this.

\* \* \*

Q All right. All right. Now, you did, though, then say that, you said, "Now, I will say this, as a result of my testimony from speaking to the Public Defender's Office a

couple minutes ago, that if something could be worked out as a result of my testify" or the word says "testify" in the transcript, but I'm sure you said testifying, "in the case, then, of course, so be it." You said that to the detectives.

\* \* \*

A No, why would I speak to the, talk, while speaking to the Public Defender's Office making something work out. That makes no sense. I don't understand it, that, that reading of that.

Q So, I'm going to show you a copy of the certified transcript of your testimony, okay?

\* \* \*

A Okay. If that's what that says, then, yes, I said it, but—

Q All right. (Unintelligible.) I'm sorry. Now, when you said to the detectives, "if something could be worked out as a result of my testimony," what you were referring to is that you had pending charges in the Circuit Court for Montgomery County at the time that you were talking to the detectives on January 8th, 2007, correct?

A Yes, I did.

Q All right. And those pending charges were second degree assault, right?

A Yes.

Q And reckless endangerment.

A Reckless endangerment, yes.

Q Okay. And you'd been incarcerated and held on a bond, correct?

A Uh-huh. Yes.

Q That you hadn't paid, right?

A Yes.

Q And do you remember what your bond was?

A $10,000.

Q $10,000. So, when you said, "if something could be worked out as a result of me testifying in the case," what you were saying to the detectives was if they were to do

something good for you on your case, second degree assault and reckless endangerment charges, then so be it. And that's what you said, right?

\*　　\*　　\*

A I will make clear that if I'd said that, if I made a statement, which apparently I did make that statement, I was trying to say if something was, you know, then so be, then, okay, you know what I mean? But I'm not—doing this for that reason, okay? Which was cleared up in the next statement, which I said, but I'm doing this completely with no promise or nothing like that. I'm not doing that for that reason. I wanted to make that absolutely clear.

\*　　\*　　\*

Q Mr. Watson, I want to talk to you a little bit about what was going on in your life on January 8th, 2007, okay, when you called the State's Attorney's Office, okay?

A Uh-huh.

\*　　\*　　\*

Q Okay. Now you were on probation on that day for a theft charge that you had pled guilty to on August 14, 2006, correct?

A Yes, that's correct.

Q You were on 18 months probation.

A That's correct.

Q All right. While you incarcerated in the Montgomery County Detention Center between October and January of 2007, you were involved in a fight with another inmate, correct?

A Yes.

\*　　\*　　\*

Q And, as a result of that fight, you were charged with second degree assault—

A Yes.

Q —a crime, right? Okay. Now, on January 4th, 2007, you appeared in the District Court for Montgomery County on your assault charges, second degree assault charges, correct?

A Yes.

&ast; &ast; &ast;

Q Well, when you pled guilty on January 4th, 2007, you were in violation of your probation, because you picked up a new charge while on probation, correct?

A To the extent, I guess, yes.

&ast; &ast; &ast;

Q Okay. Now, I want to ask you some questions about how it was that you were released from the detection center, okay? You had a disposition conference on January 11th in front of Judge Saunder, correct?

A Yes.

&ast; &ast; &ast;

Q And you said to the judge, "Judge, I waive my right to a lawyer. I need to have a bond review today." That's what you said. Do you remember that?

A Yes.

&ast; &ast; &ast;

Q All right. Exactly. That was your whole purpose of waiving your lawyer to expedite your bond review, correct?

A Yes.

Q All right. Now, at that disposition hearing, there was a State's Attorney, right?

A Ms. Lynch, yes.

Q Ms. Lynch. And Ms. Lynch told the court that there was a plea offer for time served, correct?

A Yes.

Q All right. And she expressly told the judge that she was asking for a bond review so that your bond could be changed to a personal bond, correct?

A No. The judge asked her is that okay. The judge said would you be willing to go forward with the bond review today because Mr. Watson has waived his right to an attorney. She said, she was kind of hesitant, but she, she, she said, yeah. And, actually, that was my first time hearing of the charges being dropped.

She told, that's what I first was explaining that my attorney, it was, it was already discussed with my attorney that, not the charges being dropped, excuse me, but me taking a plea to time served. Had my attorney would have discussed that with me, I would, I would have told my attorney no. And if it meant for me to sit in jail some more, that's what it would have meant, because I was not pleading to anything.

\* \* \*

Q Now, Mr. Watson, well, let me ask you this. From the time that you were released or pled guilty on January 4th, 2007 to the assault charge involving the jail until today, isn't it true that you've never been charged with a violation of probation for the case that you were put on probation on August 14, 2006?

A And that's true, but that's because there's facts behind that explaining why.

\* \* \*

Q Did the State say on the record they were not opposing your bond review?

A With some hesitation at first, yes.

Maura Lynch, the Assistant State's Attorney assigned to Mr. Watson's reckless endangerment case, also testified at the *in limine* hearing. The opinion of the Court of Special Appeals includes the following summary of her testimony:

Lynch, the prosecutor assigned to Watson's case, testified that her decision to enter a *nolle prosequi* for Watson's charges was "based on the fact that my case had insufficient evidence at the time of the trial date to proceed." She denied the existence of any deal or bargain with Watson

regarding his charges and his testimony in appellant's case. Lynch also explained that the decision to have Watson's bond reduced from $10,000 to personal bond was because "[she] did not feel it was appropriate that Watson be incarcerated due to the fact that he was supposed to have been released six weeks ago" and not due to his testimony.

*Leon Steven Calloway v. State, supra,* slip opinion at pp. 9–10.

The Circuit Court ultimately granted the State's motion *in limine,* stating:

Well, the issue that is before the court is whether Mr. Watson believed that he was going to get a benefit from the government with respect to the pending assault and reckless endangerment charges that he was facing, in return for his testimony at Mr. Calloway's trial.

You know. I did find Mr. Watson to be credible. I thought he was very adamant in his testimony that, as he said, that he made it quite clear that he didn't want any help with his cases, that his only motive was from the heart. I thought he was very articulate when he talked about his concern about the defendant speaking about the baby as if it was an inanimate object and that he was upset about what he perceived to be Mr. Calloway's arrogance towards the case.

Now, the Court notes that it was Detective Wilshire that apparently brought up the issue of the expectation of some benefit and that was when Mr. Watson said that it was his heart and conscience that were telling him to give information, that he wasn't doing it for any benefit. The language that the defense, I think, has emphasized, I really don't think that him saying, "Well so be it[,]" if I get something else but that's not why I'm doing it.

I don't think that that was done in exchange, I think, I find clearly that he really had no hope or expectation. He's basically saying, you know, I'm just doing this because I think this is the right thing to do, and if you're telling me

that maybe there might be something else, well then, so be it but that's not why I'm doing it. That's how I perceive it.

\* \* \*

I have reviewed the *Ebb* case, the *Leeks* case, the *Watkins* case. Mr. Watson testified, I think there had been some testimony last Monday that this wasn't the only case, that there was other charges, other cases. The other cases where he was a victim, as he testified, he really had nothing to gain by testifying here.

It was clear from Ms. Lynch's testimony that the State's decision to enter [a] nolle pros had nothing to do with this case whatsoever. Also, I think defense counsel asked a question of Ms. Lynch about, let me go back to her testimony. About her not asking about getting the case continued to be able to find the victim, but that was back on the April date and there had been a prior question about whether or not that was the first trial date.

And we all know, if it wasn't the first trial date, if it had come up once before and then had been continued and then, most likely, I mean nobody really asked a question about that, but Ms. Lynch was consistent in her testimony saying that she couldn't find the victim, that she has been trying to find the victim and that she had given the detective like a date by which he had to find the victim. So the fact that there was no continuance that was asked for in April, I mean, clearly that was not the first trial date. Clearly there had been a prior continuance and she still hasn't been able to locate him.

You know, I've looked at these cases, I've done a balancing test. I really don't think that defense really has presented a case that would be sufficient for me to deny the State's motion. I've done the balancing test that *Ebb* talks about, balancing the probative value against the prejudicial effect and I'm going to grant the State's motion to preclude the defense from questioning Mr. Watson from any expectation of leniency because I don't think he had any. I think he

was very clear where he said nothing was ever expected, nothing was ever wanted, nothing was ever asked for.

## Discussion

 While it is clear that the trial judge is not obligated to allow cross-examination about every charge pending against a State's witness, Md. Rule 5–616(a)(4) grants the criminal defendant the right to question a State's witness about facts that are of consequence to the issue of whether "the witness is biased, prejudiced, interested in the outcome of the proceeding, or has a motive to testify falsely." Circumstantial evidence of a witness's self interest is admissible because, as the Supreme Court of North Dakota has stated, "even an untruthful man will not usually lie without a motive." *Gates v. Kelley,* 15 N.D. 639, 110 N.W. 770, 773 (1906).

In *Collins v. State,* 318 Md. 269, 568 A.2d 1 (1990) *cert. denied,* 497 U.S. 1032, 110 S.Ct. 3296, 111 L.Ed.2d 805 (1990), while affirming a first degree murder conviction, this Court held that the Circuit Court had committed "harmless error" when it prohibited the defense from cross-examining an admitted accomplice about drug possession charges pending against that witness at the time of his testimony. *Id.* at 282, 568 A.2d at 7. The Circuit Court prohibited the cross-examination for two reasons: (1) the accomplice had not been convicted of the possession charge and (2) there were other persons in proximity to the drugs at the time the drugs were found. *Id.* at 281–82, 568 A.2d at 7. This Court ultimately concluded that, because there was sufficient evidence of the accomplice's drug involvement to allow the jury to assess his credibility, and because the accomplice had outlined his plea agreement with the State during his direct examination, the trial judge's restriction was harmless error. *Id.*

In *Watkins v. State,* 328 Md. 95, 613 A.2d 379 (1992), while affirming "unlawful shooting with intent to disable" convictions, this Court held that defense counsel was not entitled to ask one of the victims and one of the victims' friends whether they were currently on probation. *Id.* at 102–03, 613 A.2d at

382–83. Watkins defended the charges against him by claiming that he acted out of self-defense at a meeting with the victims that involved the sale of some "bad" drugs. Although Watkins' trial counsel did not suggest that either of these witnesses had received probation as a *quid pro quo* for their favorable testimony in this case, he did argue that the probationary status of these witnesses gave them an additional reason to deny any involvement with drugs. *Id.* at 102, 613 A.2d at 382. Although this Court stated that there was "some merit in that contention," and that the Circuit Court did have discretion to admit the "probation" evidence, we ultimately concluded that the Circuit Court did not abuse its discretion when it excluded that evidence on the ground "that under the circumstances of this case the limited probative value of the evidence was outweighed by other appropriate considerations." *Id.* at 102–03, 613 A.2d at 382–383.

In *Ebb v. State,* 341 Md. 578, 671 A.2d 974 (1996), while affirming murder convictions, a majority of this Court held that the Circuit Court did not abuse its discretion in precluding the cross-examination of two State's witnesses about pending criminal and/or violation of probation charges pending against them at the time of their testimony. *Id.* at 590–91, 671 A.2d at 980. In that case, the Circuit Court held an evidentiary hearing to determine whether three State's witnesses could be cross-examined about pending charges. At the conclusion of this hearing, the Circuit Court ruled that cross-examination about pending charges would be (1) permitted with respect to the one witness who had acknowledged his hope of future consideration, but (2) prohibited with respect to Lawrence Allen and Todd Timmons, because those two witnesses had denied expecting anything in return for their testimony. *Id.*

In a dissenting opinion joined by Judge Eldridge, Chief Judge Bell stated:

> In this State, in a jury trial, it is well settled that it is the function of the jury, rather than the trial judge, to judge the credibility of the witnesses, to weigh their testimony, and to resolve contested facts. *Bohnert v. State,* 312 Md. 266, 278–

79, 539 A.2d 657, 663 (1988); *Gore v. State,* 309 Md. 203, 210, 214, 522 A.2d 1338, 1341, 1343 (1987); *Wilson v. State,* 261 Md. 551, 566, 276 A.2d 214, 221 (1971); *Jacobs v. State,* 238 Md. 648, 650, 210 A.2d 722, 723 (1965). *See also Dykes v. State,* 319 Md. 206, 224, 571 A.2d 1251, 1260 (1990).

\* \* \*

The petitioner does not claim that the State promised Timmons and Allen anything. For this reason, the petitioner has never challenged the accuracy of the State's representation that it made no promises. The petitioner's position, rather, is that whether or not Timmons and Allen subjectively expected to obtain some benefit for their testimony, the jury conceivably could have so found. The jury was not, therefore, obliged to accept the witnesses' disclaimer. Accordingly, cognizant that the jury, as the trier of fact, is charged with responsibility for resolving credibility issues, the petitioner sought to cross-examine the witnesses as to their bias, interest, motivation, or the like, all of which are proper subjects of cross-examination. As discussed supra, the focus of the petitioner's inquiry was for the purpose of putting before the jury information on the basis of which it could infer that the witnesses' testimony lacked credibility and, thus, should be discounted.

In this case, the trial court's ruling prevented the jury from ever considering whether the witnesses were biased or otherwise interested in the case. The court did so by determining that the petitioner did not lay a proper foundation to entitle him to cross-examine the witnesses. This result, in turn, was reached in two ways. First, the court made a credibility determination, assessing whether witnesses testified truthfully when they denied expecting a reward or favorable treatment in connection with their pending charges for their testimony. Second, the court placed on the petitioner the impossible burden of proving by direct evidence from the witnesses themselves, the witnesses' state of mind. On both counts, the trial court erred. Certainly, there is no legal requirement that a witness' state of mind be proven by direct evidence. And, as discussed

supra, credibility issues in a jury trial are matters reserved for resolution by the jury. Moreover, the trial court's right to limit cross-examination does not extend to the point of preventing cross-examination altogether in an area that is a traditional focus of cross-examination.

*Id.* at 596–597, 602–03, 71 A.2d at 983, 986.

Neither *Watkins* nor *Ebb* involved a witness who had volunteered to testify for the State, or who had already received any benefit prior to testifying at trial. Moreover, the falsity of a prosecution witness's denial of hope for leniency in a pending matter can usually be established beyond any doubt by the witness's post-testimony actions. For example, if—after testifying against Ebb—Mr. Timmons or Mr. Allen requested that he receive a lenient sentence (or a reduction of a previously imposed sentence) because of his testimony in the Ebb case, such a request would appear "on the record" of the sentencing proceeding (or in the motion for reduction filed with the court).[1] In the case at bar, however, the *in limine* ruling

---

1. In *Harris v. State*, 407 Md. 503, 966 A.2d 925 (2009), while holding that a murder defendant was entitled to a new trial on the ground that the State violated its obligation to disclose that the agreements reached with two State's witnesses included a promise that—at the witness's motion for modification of sentence hearing—the State would (1) not oppose modification, and (2) advise the sentencing judge that the witness had testified truthfully when called upon to do so during the petitioner's trial, this Court stated:

 In *Ware v. State, supra,* 348 Md. 19, 41, 702 A.2d 699, 710, we confirmed, without equivocation, that "[e]vidence that the State has entered into an agreement with a witness, whether formally or informally, is often powerful impeachment evidence and the existence of such a 'deal' must be disclosed to the accused." The importance of that kind of evidence, we said, was underscored by the Supreme Court's observation in *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217, 1221 (1959) that "[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." *See also Marshall v. State,* 346 Md. 186, 197, 695 A.2d 184, 189–90 (1997) ("Where a witness has a 'deal' with the State, the jury is entitled to know the terms of the agreement and to assess whether the 'deal' would reasonably tend to indicate that his testimony has been influenced by bias or motive to testify falsely.")

excluded circumstantial evidence of Mr. Watson's self interest that was based upon what actually occurred before he was called to testify against Petitioner.

The record clearly shows that, after he made his phone call to the State's Attorney's Office, (1) Mr. Watson was released from the Montgomery County Correctional Facility, and (2) the charges pending against him were nolle prossed. Moreover, as of the date on which Mr. Watson testified in the case at bar, even though it is clear that he had entered a guilty plea that constituted a "Rule 4" violation of probation, no violation of probation charge had been filed against him. Under these circumstances, we hold that the issues of whether Watson placed the January 8, 2007 phone call in the hope of being released from detention, and whether he was testifying at trial in the hope of avoiding a violation of probation charge, should have been decided by the jury rather than by the Circuit Court.

Because the issue is whether Watson had a hope that he would benefit from volunteering to testify against Petitioner, it is of no consequence that the State had not offered to make "any deal or bargain with Watson regarding his charges and his testimony in [Petitioner's] case." It is also of no consequence that Watson's testimony before the jury would be consistent with his testimony at the *in limine* hearing. As this Court stated in *Elmer v. State,* 353 Md. 1, 724 A.2d 625 (1999):

> It would be folly to suggest that questions alone cannot impeach. This notion was well-stated by then Chief Judge Wilner, now a member of this Court, writing for the intermediate appellate court in *Craig v. State,* 76 Md.App. 250, 292, 544 A.2d 784, 805 (1988), *rev'd on other grounds,* 316 Md. 551, 560 A.2d 1120 (1989), *jdgmt. vacated on other grounds,* 497 U.S. 836, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990):

*Id.* at 521, 966 A.2d at 935–936 (footnote omitted).

Questions alone *can* impeach. Apart from their mere wording, through voice inflections and other mannerisms of the examiner—things that cannot be discerned from the printed record—they can insinuate; they can suggest; they can accuse; they can create an aura in the courtroom that the trial judge can sense but about which we could not speculate. The most persistent denials, even from articulate adult witnesses, may not suffice to overcome the suspicion they can engender. . . .

*Id.* at 15, 724 A.2d at 632.

■■■ As the Court of Special Appeals stated in *Leeks, supra:*

The issue of bias is often generated by circumstantial evidence, and does not disappear merely because the witness denies any reason to be biased. If such circumstantial evidence exists, *the trier of fact is entitled to observe the witness's demeanor as he or she responds to questions permitted by Rule 5–616(a)(4).*

When the trier of fact is a jury, questions permitted by Rule 5–616(a)(4) should be prohibited only if (1) there is no factual foundation for such an inquiry in the presence of the jury, or (2) the probative value of such an inquiry is **substantially** outweighed by the danger of undue prejudice or confusion.

110 Md.App. at 557–58, 678 A.2d at 87. (Emphasis supplied). We agree with and adopt those statements. To the extent that our analysis is inconsistent with *Watkins, supra,* and/or *Ebb, supra,* those cases are hereby overruled.

■■■ When determining whether a particular item of circumstantial "bias" evidence should be excluded on the ground that it is unfairly prejudicial and/or confusing, the trial court is entitled to consider whether the witness's self interest can be established by other items of evidence. For example, in *Ebb,* ballistics evidence established that the murder weapon was the handgun that investigating officers seized from the person of Todd Timmons. Because it is so obvious that Mr. Timmons had the strongest of motives to testify that he was not in

possession of the murder weapon when the murders occurred, it is impossible to hypothesize a juror who would have (1) believed Mr. Timmons' testimony in the absence of evidence that there were unrelated criminal charges pending against him at that time, but (2) rejected his testimony upon learning about those charges. The *in limine* ruling in the case at bar, however, prohibited Petitioner from countering the State's argument that (in the words of the prosecutor) "Nicholas Watson was genuine, heartfelt, full of emotion [and] wanted to say what [Petitioner] said to make sure that Gavin's voice was heard."

In the case at bar, there was a solid factual foundation for an inquiry into Watson's self interest, and the circumstantial evidence of Watson's self interest was not outweighed—*substantially* or otherwise—by the danger of confusion and/or *unfair* prejudice to the State. Under these circumstances, the Circuit Court erred in granting the State's motion *in limine* on the ground that it found Watson to be a credible witness. Because we are unable to declare that this error was harmless beyond a reasonable doubt, Petitioner is entitled to a new trial at which the issue of Watson's motive to testify falsely will be decided by the trier of fact on the basis of a complete factual predicate.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS VACATED; CASE REMANDED TO THAT COURT WITH DIRECTIONS TO VACATE THE JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AND TO REMAND CASE TO THE CIRCUIT COURT FOR A NEW TRIAL; COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY MONTGOMERY COUNTY.**

HARRELL, J., concurs.

HARRELL, J., concurring.

I concur with the result reached in the Majority opinion and most of the reasoning explaining that result. I depart, however, from its somewhat obscure repudiation of two of this

Court's opinions (*Ebb v. State,* 341 Md. 578, 671 A.2d 974 (1996); and *Watkins v. State,* 328 Md. 95, 613 A.2d 379 (1992)), apparently in favor of the dissent in *Ebb* and a Court of Special Appeals's opinion, *Leeks v. State,* 110 Md.App. 543, 678 A.2d 80 (1996), authored by Judge Murphy while serving on the intermediate appellate court.

The Majority opinion need not overrule any part of either *Ebb* or *Watkins* in order to reach its goal in the present case. Rather, *Ebb* and *Watkins* may be distinguished from the case at hand on the basis explained by the Majority opinion at 635–37, 996 A.2d at 879–81. Moreover, when this Court disapproves its earlier precedent, in whole or in part, it should do so on a principled basis transparently explained in the subsequent opinion. I cannot say that the Majority opinion here does so and most certainly it does not persuade me to join its rejection of *Ebb* and *Watkins.*